**UNITED STATES of America, Plaintiff,**

v.

**Manuel Amedee Amy VALENTINE, Felix Juan Feliciano Rosario, Hernando Delgado Acevedo, Digno Rafael Ortiz Rivera, Miguel Quiñones Mendoza, Jose Del Carmen Garcia Miranda, Juan M. Rivera Negron, Ricardo Ivan Zengotita Ramos, Florencio Merced Rosa, Ruben Arcelay Medina and Edwin Feliciano Grafals, Defendants.**

Crim. Nos. 6–67, 8–67, 15–67, 16–67, 67–67, 73–67, 74–67, 75–67, 77–67, 80–67, 81–67.

United States District Court
D. Puerto Rico.

Aug. 20, 1968.

Francisco A. Gil, Jr., U. S. Atty., Blas Herrero, Jr., Asst. U. S. Atty., San Juan, P. R., Marshall Tamor Golding, Atty., U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Marvin Karpatkin, New York City, Roberto Busó Aboy, San Juan, P. R., Rubén Berrios, Rio Piedras, P. R., Luis M. Villaronga, San Juan, P. R., Rabinowitz, Boudin & Standard, New York City and Olaguibeet López Pacheco, Hato Rey, P. R., for defendants.

## MEMORANDUM AND ORDER *

Defendants herein have been individually indicted for refusing to submit to induction into the armed forces of the United States in violation of 50 U.S.C. App. §§ 454, 462 and Selective Service Regulations, § 1632.14(b) (5).[1] All of them have moved to dismiss their indictments on procedural and substantive grounds, and seven of them have moved in addition for sundry pretrial relief.[2] All cases were consolidated for hearing on the several motions, at which all parties were represented by counsel. Evidence was heard where appropriate, oral argument was had on all motions, and both sides have submitted briefs. For the reasons stated herein, the Court has concluded that all of defendants' motions should be denied. This opinion will serve in place of findings of fact and conclusions of law.

## I. PROCEDURAL VALIDITY OF THE INDICTMENT

Defendants attack the procedural validity of their indictments (and of the petit jury array as well) upon three separate grounds. They contest the constitutionality of the statutory requirement that proceedings in this Court be conducted in English,[3] and of the statutory limitation of jury service in this court to

---

\* Judge J. B. Fernández—Badillo of this Court has read this opinion and agrees with it.

1. Certain of the defendants are also charged with the related offenses of failing to have their registration certificates and/or their notices of classification in their personal possession (Selective Service Regulations, §§ 1617.1 and 1623.5).

2. The defendants in the four cases designated herein as United States v. Amy Valentine, et al., Criminal Nos. 6–67, 8–67, 15–67, 16–67, have severally filed:
 1. Identical motions to dismiss their indictments on the grounds that the grand jury which indicted them was unlawfully and unconstitutionally convened, by reason of the English language requirement for jurors of 48 U.S.C. 867, and otherwise.
 2. Identical motions to dismiss their indictments on the grounds that (a) they do not state facts sufficient to constitute an offense, (b) application of the Selective Service Act to Puerto Ricans is unconstitutional, (c) the Act is not intended to apply to Puerto Rico, and (d) the government does not have the constitutional power to induct Puerto Ricans who reside in the Commonwealth of Puerto Rico into the armed forces for the purpose of military service abroad.
 The defendants in the seven cases designated herein as United States v. García Miranda, et al., Criminal Nos. 73–67, 67–67, 74–67, 75–67, 77–67, 80–67, 81–67, have jointly filed:
 1. An omnibus motion to dismiss their indictments on the grounds that:
 a. The grand jury which indicted them was unlawfully and unconstitutionally convened, and was selected pursuant to 48 U.S.C. 867 which is unconstitutional.
 b. The indictments do not state facts sufficient to constitute an offense.
 c. Application of the Selective Service Act to Puerto Ricans is unconstitutional.
 d. The Act is not intended to apply to Puerto Rico and, alternatively, the government does not have the constitutional power to induct Puerto Ricans who reside in the Commonwealth of Puerto Rico into the armed forces for the purpose of military service abroad.
 e. The requirement of 48 U.S.C. 864 that proceedings in this court be conducted in English is unconstitutional.
 2. A motion to dismiss the petit jury array on the grounds that:
 a. The jury list from which the array will be drawn was unconstitutionally compiled, by reason of the English language requirement of 48 U.S.C. 867 and otherwise.
 b. The requirement of 48 U.S.C. 864 that proceedings in this Court be conducted in English is unconstitutional.
 3. A motion for discovery under Rule 17(c), F.R.Crim.P., seeking an order directing the Secretary of Defense to produce certain documents.
 4. A motion for leave to take depositions abroad pursuant to Rule 15(a), F.R. Crim.P.
 Motions were also filed by all defendants for bills of particulars, but these motions have already been disposed of.

3. The second paragraph of 48 U.S.C. 864 provides: "All pleadings and proceedings in the District Court of the United States for Puerto Rico shall be conducted in the English language."

those who are literate in and have an adequate knowledge of English.[4] Additionally, they assert that the jury list from which the grand jury was and the petit jury will be drawn was unlawfully compiled and does not constitute a cross-section of the Puerto Rican community.

Their challenge raises interrelated questions the key to the solution of which lies in the resolution of their attack on 48 U.S.C. § 864. Clearly, if that statute constitutionally requires proceedings in this court to be conducted in English, it is equally constitutional to require adequate comprehension of English as a condition for jury service here; one could hardly serve as a juror if he could not understand the proceedings in court. See Miranda v. United States, 255 F.2d 9, 16–17(C.A.1).[5] And if literacy and competency in English may constitutionally

be imposed as qualifications for jury service, the cross-sectional adequacy of the jury list and of the methods by which it was compiled must be judged in that context.

A. *Constitutionality of the English language requirements.*

Defendants question Congress' constitutional authority to require that proceedings in a court which is part of the federal judicial system be conducted in English.[6]

In any other district court, the contention would be too patently frivolous to require an answer. But Puerto Rico is unique among the judicial entities in which United States district courts are located. As the Supreme Court of Puerto Rico recently held, "the vehicle of expression, the language of the Puerto

---

4. The present 28 U.S.C. § 1861 provides, in pertinent part: "Any citizen of the United States who has attained the age of twenty-one years and who has resided for a period of one year within the judicial district, is competent to serve as a grand or petit juror unless * * * (2) he is unable to read, write, speak, and understand the English language."

The present 48 U.S.C. § 867 provides, in pertinent part: " * * * the qualifications required of jurors in [this] court shall be that each shall * * * have a sufficient knowledge of the English language to enable him to serve as a juror * * *."

Section 867 was first enacted in 1906, at a time when federal jurors were required to have the same qualifications as jurors in the highest court of the state in which the federal court was located. Since jurors in Puerto Rican courts were required to be literate in Spanish, but not necessarily in English, a special provision was needed for this court. The statute will be repealed on December 22, 1968, when the newly enacted Jury Selection and Service Act of 1968 (P.L. 90–274, 82 Stat. 53) goes into effect. After that time, jurors in all federal courts, including this one, will be subject to the qualifications set forth in the new 28 U.S.C. § 1865(b), which provides, *inter alia*, that a prospective juror is qualified "unless he * * * (2) is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the ju-

ror qualification form; (3) is unable to speak the English language."

5. It should be noted at the outset that this case is not in any manner governed by Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828, which upheld the constitutionality of 42 U.S.C. § 1973b(e), under which Puerto Rican residents of continental United States who are literate in Spanish but cannot speak or understand English are permitted to vote in elections there. *Katzenbach* did not hold that the "equal protection" clause of the Fourteenth Amendment, of its own weight, forbids a state to deny the franchise to a Puerto Rican who is literate in Spanish but not in English, but rather that the "appropriate legislation" clause (§ 5 of the Amendment) empowers Congress to outlaw the denial legislatively. 384 U.S. at 648 et seq., 86 S.Ct. 1717. Moreover, as the Court pointed out (id. at 655, 86 S.Ct. 1717), knowledge of English is unnecessary for an elector to exercise his franchise effectively. Manifestly, however, effective jury service requires knowledge of the language in which the proceedings are conducted.

6. Both § 864 and § 867 were originally Congressional enactments only. In their present status, as § 42 and § 44 of the Federal Relations Act, they were continued in force and effect by P.L. 600, 81st Cong., 64 Stat. 319, § 4, and hence were ratified by the people of Puerto Rico by the vote which accepted the compact.

Rican people—an integral part of our origin and our Spanish culture—has been and continues to be the Spanish language." People v. Superior Court, Opinion No. 65–111, June 30, 1965 (unreported), Bar Association slip opinion, p. 6. No other federal district court is located in a state or territory in which the primary language of a majority of the American citizens resident therein is other than English. Indeed, Congress from the beginning has recognized that Puerto Rico is unique, in that it is fully populated by a homogeneous Spanish-speaking people "living in compact and ancient communities, with definitely formed customs and political conceptions" (Balzac v. People of Porto Rico, 258 U.S. 298, 310, 42 S.Ct. 343, 347, 66 L.Ed. 627), and hence has never attempted to force English upon the people of this island as the language in which local government proceedings are to be conducted.

■ It does not follow, however, that because proceedings in local courts are conducted in Spanish, proceedings in this court must also be conducted in that language. This court is not a local court of Puerto Rico. Rather, it is a United States district court, part of the federal judicial system, litigating cases arising under the Constitution and laws of the United States or by reason of diversity of state citizenship. See Balzac v. People of Porto Rico, supra, 258 U.S. at 312, 42 S.Ct. 343; Mora v. Mejías, 206 F.2d 377, 382 (C.A.1, 1953); Miranda v. United States, supra, 255 F.2d at 13; United States v. Montañez, 371 F.2d 79, 83–84 (C.A.2, 1967). Hence, the very reasoning which led the Supreme Court of Puerto Rico to conclude that proceedings in the Commonwealth courts need be conducted only in Spanish applies in reverse to justify conducting proceedings in this court in English. Just as Spanish is "the language of the Puerto Rican people" (People v. Superior Court, supra), the United States has from the time of its independence been an English-speaking nation. Although the American population has included occasional enclaves of foreign-speaking peoples, there has never been any tradition of official bilingualism, such as prevails in countries like Canada, Belgium, Switzerland or India. The past history of the United States discloses no more than occasional minor and temporary accommodations to the language preferences of foreign-speaking peoples where they comprised a substantial segment of the original population of newly acquired areas.[7] But no

7. For example, Louisiana once permitted members of its state senate and house of representatives to address those bodies in either French or English, and required the secretary of the senate and clerk of the house to be conversant in both languages. Constitution of 1845, Art. 104. The provision was left out of succeeding constitutions, however, and the Constitution of 1864 specifically forbade exclusion from office because of not being conversant with any language other than English. Art. 128. There were also early requirements that the state constitution and laws be promulgated in both French and English (Constitution of 1845, Art. 132; Constitution of 1852, Art. 129), but thereafter promulgation was limited to English, with the legislature merely given discretion to provide for publication of the laws in French and to prescribe that judicial advertisements in certain designated cities and parishes be made in that language. Constitution of 1879, Art. 154; Constitution of 1898, Art. 165; Constitution of 1913, Art. 165. The only language provision in Louisiana law today is one which provides that statutes and the legislative journal are to be printed in English only. La.Rev.Stat. (1950), §§ 43:18, 43:19. Similarly, when California first entered the union, all state laws, decrees and regulations were required to be published in both English and Spanish (Constitution of 1849, Art. II, § 21), and the Kearney Code, promulgated in 1846 by Brig. Gen. S. W. Kearney for the government of the newly conquered territory of New Mexico, contained a provision requiring courts to keep records of their proceedings in English and Spanish. The latter provision was not continued in the New Mexico Organic Act of 1850, and the subsequent California constitution specifically limited publication of official proceedings to the English language. Constitution of 1879, Art. 4 § 24. Finally,

Continental American court, federal or state, has ever conducted its proceedings in any language other than English.[8] Thus, while it was proper for Congress to recognize from the beginning Puerto Rico's uniqueness among newly acquired territories, and not force English here as the official local language (as it could have done before commonwealth status was agreed upon), it is equally proper that this court, being a federal rather than a local court, conduct its proceedings in the English rather than the Spanish language. As the Commonwealth Supreme Court recognized, the language requirements of §§ 864 and 867 "are in agreement with and in line with the tradition that the judicial proceedings throughout the whole federal jurisdiction be conducted in the English language." People v. Superior Court, supra.

Indeed, it is difficult to conceive how this court could remain a viable part of the federal judicial system if proceedings here were conducted in Spanish. The basic civil function of federal district court "in offering an opportunity to non-residents of resorting to a tribunal not subject to local influence" (see Balzac v. People of Porto Rico, supra, 258 U.S. at 312, 42 S.Ct. at 348) would be compromised and unreasonably restricted here, were litigants forced, in order to avail themselves of the facilities of this court, to litigate through interpreters in a language other than English. Similarly, this court's function as the forum in this district for the vindication of federal criminal laws and the resolution of civil controversies to which the United States is a party would be compromised were the Attorney General of the United States unable to appear here personally on the government's behalf unless he were conversant with Spanish, and were he limited by similar considerations in designating a member of his staff to appear. There would also be an anomalous limitation, unique within the federal system, on judges from other districts who could sit here by designation when needed. Moreover, the statutes which this court applies are (except in those instances where commonwealth or foreign statutes are at issue) written in English. The consequent necessity of phrasing an indictment or civil complaint in Spanish upon the basis of a statute written in English would manifestly lend itself to the strong possibility of injustice through distortion of meaning in translation. Similar possibilities of injustice would arise on appeal, where the entire record would have to be translated back into English.[9] Finally, this court, and the attorneys who practice here, would be effectively in-

the Organic Act of Hawaii permitted territorial electors to qualify if they could speak, read and write either English or Hawaiian (§ 60; 48 U.S.C. § 617), but required all legislative proceedings to be conducted in English. § 44; 48 U.S.C. § 577.

8. The first and most of the subsequent constitutions of Louisiana, for example, required judicial written proceedings to be conducted in English. Constitution of 1812, Art. 6, § 15; Constitution of 1845, Art. 103; Constitution of 1864, Art. 103; Constitution of 1868, Art. 109; Constitution of 1879, Art. 154; Constitution of 1898, Art. 165; Constitution of 1913, Art. 165. Additionally, the Constitution of 1868 forbade any law requiring judicial process to be issued in any language other than English. Art. 109. The California Constitution of 1879 also required that judicial proceedings be conducted only in English (Art. 4, § 24), and the

Organic Act of Hawaii expressly repealed the former laws of the Republic of Hawaii which had provided for juries of either aliens or natives, and required instead that territorial jurors be literate in English. § 83; 48 U.S.C. § 635.

9. The record, of course, has to be translated into English when appeals are taken from the commonwealth courts to federal courts. There is, however, the same narrow jurisdiction for and scope of review in such appeals as obtains in federal appeals from the action of state courts. See 48 U.S.C. § 864. Unlike the final judgments of this court, therefore, which are reviewable in all particulars as of right by the court of appeals, the final judgments of the commonwealth courts are infrequently subject to federal review, and such review rarely involves questions whose resolution necessitates a precise parsing of the language appearing in the record.

sulated from the body of law developed throughout the rest of the federal system, since the opinions of all other federal courts and the legislative histories of all federal enactments are published only in English.[10]

■ These considerations are not counterbalanced by any prejudice to litigants arising from the English language requirements. There is no real risk of litigants being tried by juries unable to understand the evidence since if any veniremen lack sufficient facility with English to render competent jury service, they can be and are eliminated on *voir dire*. No evidence was adduced to show that the *voir dire* process is inadequate in practice for this task.[11] While some of the criminal defendants here are tried in a language they do not understand, the problem is not unique to this district; the situation arises in other districts as well, although concededly not to the same extent as it does here.[12] A defendant's right to a fair trial, however, is personal, not collective; a non-English speaking defendant could not be thought to be the less prejudiced if he is tried in a district

where few defendants are in the same situation than if he is tried in a district where many are. It is thus no more of a constitutional violation to try non-English speaking defendants in English in this court than to try other non-English speaking defendants in English in any other federal district court. Moreover, none of the defendants in these cases have attempted a showing of standing to raise the issue by asserting a lack of proficiency in English.

■ Defendants' main contention is that the English language requirements are unconstitutional because they preclude grand and petit juries drawn from a cross-section of the Puerto Rican community. There is no constitutional requirement, however, that juries be drawn from a cross-section of the *total* population without the imposition of any qualifications.[13] Aliens may be excluded from jury service without constitutional infringement (United States v. Wood, 299 U.S. 123, 145, 57 S.Ct. 177, 81 L.Ed. 78), as may minors. George v. United States, 196 F.2d 445, 452–454 (C.A.9, 1952), certiorari denied, 344 U.S. 843, 73 S.Ct. 58,

---

10. English translations of the annotated Laws of Puerto Rico and of the reports of the Supreme Court of Puerto Rico are published and available for use in those cases in this Court where local law is applicable. It is doubtful, however, in view of the prohibitive cost and limited market, if the publishers of the Federal Reports, the United States Code Annotated, and the other lawyers' tools for research into federal law would undertake to publish simultaneously in Spanish as well as English let alone publish translations of all past volumes. This court would have no power to compel them to do so.

11. Defendants' expert witness did testify that, in his "personal non-expert judgment," he "would like a person to be a native speaker of the language" in order to be a juror. The Court does not deem this statement to be worthy of any weight as evidence. The limitation which the witness proposed, which would preclude jury service throughout the rest of the United States both by Puerto Ricans and by all naturalized citizens other than those coming from English speaking countries, would clearly be unconstitutional.

12. Each of the two judges in this district is authorized to have a full time interpreter. The records of the Administrative Office of the United States Courts indicate that one full time interpreter is provided to serve two judges and one retired judge in both the El Paso Division of the Western District of Texas and the San Diego Division of the Southern District of California, and that one per diem interpreter is provided for the San Antonio Division of the Western District of Texas. And, of course, cases arise from time to time in other districts in which the services of an interpreter are required.

13. In Smith v. State of Texas, 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84, the Supreme Court said that "[i]t is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community." In the very next sentence, however, the Court added that it is "the exclusion from jury service of *otherwise qualified groups*" because of "racial discrimination" which violates the Constitution (emphasis added).

97 L.Ed. 656. Literacy, residence tenure, and lack of unamnestied felony conviction qualifications are imposed for jury service by 28 U.S.C. § 1861, and no one suggests that they are constitutionally invalid. It has been held that there is nothing in the Constitution which prohibits the legislative limitation of jury service to males (Strauder v. State of West Virginia, 100 U.S. 303, 310, 25 L. Ed. 664; see also Hoyt v. State of Florida, 368 U.S. 57, 60, 65, 82 S.Ct. 159, 7 L. Ed.2d 118), freeholders and taxpayers (Strauder v. State of West Virginia, supra; Brown v. Allen, 344 U.S. 443, 473, 73 S.Ct. 397, 97 L.Ed. 469), and those meeting educational, character, judgment and intelligence qualifications (Strauder v. State of West Virginia, supra; Gibson v. State of Mississippi, 162 U.S. 565, 589, 16 S.Ct. 904, 40 L.Ed. 1075; Franklin v. State of South Carolina, 218 U.S. 161, 167–168, 30 S.Ct. 640, 54 L.Ed. 980), or which prohibits reasonably imposed occupational exclusions (Rawlins v. State of Georgia, 201 U.S. 638, 640, 26 S.Ct. 560, 50 L.Ed. 899) or the use of "blue ribbon" juries. Fay v. People of State of New York, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043. Clearly the sanctioning of these qualifications and limitations is irreconcilable with the contention that the Constitution requires that juries be drawn from a cross-section of the total community. Only this term, in fact, the Supreme Court indicated that jurors who under no circumstances could impose the death penalty may be excluded in capital cases. (Witherspoon v. State of Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776), with only Mr. Justice Douglas objecting in dissent that the Constitution requires that a jury be "impartially drawn from a cross-section of the community" (391 U.S. at 524, 88 S.Ct. at 1778, 20 L.Ed.2d at 786) and hence that such exclusions are constitutionally impermissible. Id. 391 U.S. at 531–532, 88 S.Ct. 1770, 20 L.Ed.2d at 788.

■ What the Constitution does prohibit is the denial to a litigant of a fair trial by an unbiased and impartial tribunal. Brown v. State of New Jersey, 175 U.S. 172, 175, 20 S.Ct. 77, 44 L.Ed. 119; Hayes v. State of Missouri, 120 U.S. 68, 71, 7 S.Ct. 350, 30 L.Ed. 578; Northern Pacific R. R. Co. v. Herbert, 116 U.S. 642, 646, 6 S.Ct. 590, 29 L.Ed. 755. It is upon this basis that the deliberate legislative or administrative exclusion of Negroes from jury service (or the deliberate limitation of members of that race to token representation on jury lists, calculated to minimize the possibility that any of them will actually serve as a juror) is deemed a constitutional violation. Strauder v. State of West Virginia, supra, 100 U.S. at 308, 25 L.Ed. 664; Ex parte Virginia, 100 U.S. 339, 345, 25 L.Ed. 676; Neal v. State of Delaware, 103 U.S. 370, 396, 26 L.Ed. 567. The Supreme Court explained, in establishing the rule against Negro exclusion in *Strauder*, that the denial upon racial grounds of the right to serve as a juror is "a stimulant to that race prejudice which is an impediment to securing to individuals of that race equal justice which the law aims to secure to all others." 100 U.S. at 308, 25 L.Ed. 664. More recently, the Court reiterated this rationale, stating that "a Negro who confronts a jury on which no Negro is allowed to sit * * * might very well say that a community which purposely discriminates against all Negroes discriminates against him." Fay v. People of State of New York, supra, 332 U.S. at 293, 67 S.Ct. at 1630.

It does not follow, however, that all exclusions can be presumed to prejudice jury fairness. If they could be, aliens could not be tried before juries composed only of citizens, minors could not be tried before juries composed only of adults, non-residents and new residents could not be tried before juries composed only of those with residence tenure, the unlettered could not be tried before juries composed only of those who are literate, and recidivists could not be tried before juries from which those with unamnestied convictions are excluded. As the Supreme Court explained in *Fay*, the presumption that exclusionary practices directed against Negroes "can carry such unjust consequences as to amount

to a denial of equal protection or due process of law" (332 U.S. at 283, 67 S.Ct. at 1625) draws its weight from "the long history of unhappy relations between the two races". Id. at 282, 67 S.Ct. at 1624; set also Hoyt v. State of Florida, supra, 368 U.S. at 68, 82 S.Ct. 159. The special circumstance presented by racial prejudice, and its potentially debilitating impact upon jury fairness, has been in fact so clearly recognized that for almost one hundred years federal legislation has forbidden and penalized the disqualification from federal or state jury service "on account of race, color or previous condition of servitude" of any "citizen possessing all other qualifications which are or may be prescribed by law." Act of March 1, 1875, ch. 114, § 4, 18 Stat. 336, formerly 8 U.S.C. § 44, now 18 U.S.C. § 243. While it is possible for exclusions upon other than racial grounds to affect jury fairness, "one who would have the judiciary intervene on grounds not covered by [18 U.S.C. § 243] must comply with the *exacting* requirements of proving *clearly* that *in his own case* the procedure has gone *so far afield* that its results are a denial of equal protection or due process" (emphasis added). Fay v. People of State of New York, supra, 332 U.S. at 283–284, 67 S.Ct. at 1625. Indeed, there have been only two cases in which the Supreme Court has struck down as unconstitutional exclusionary practices directed against other than Negroes.[14] The first was Hernandez v. State of Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866, where both the defendant and the excluded group were persons of Mexican descent and the Court found that such persons occupied a segregated place in the community from which the case arose, similar, if not identical, to the one occupied by Negroes, 347 U.S. at 479–480, 74 S.Ct. 667. The second is *Witherspoon,* supra. The jury in that

case was entrusted with the duty of recommending death or imprisonment as the penalty, if it returned a guilty verdict, and veniremen were excluded for cause if they merely had reservations about, rather than absolute scruples against, capital punishment. The Court held that a narrow exclusion of those with absolute scruples would have had the reasonable justification of being calculated to produce a jury "simply 'neutral' with respect to penalty," but that the broader exclusion of those with mere reservations lacked this reasonableness and was calculated to produce "a tribunal organized to return a verdict of death." 391 U.S. at 520–521, 88 S.Ct. at 1776, 20 L.Ed.2d at 784. But while the Court reversed as to penalty, it affirmed as to guilt because the petitioner failed to substantiate his contention that a jury consisting only of persons with no death reservations is prosecution prone, instead of unbiased on the question of guilt. Id. at 516–518, 88 S.Ct. 1770, 20 L.Ed.2d at 782.

■ There is nothing in the record before this Court which in any way suggests that the exclusion from jury service in this district of persons not literate in English—which the Court expressly finds to be the necessary consequence of the reasonable requirement that proceedings in this court be conducted in English—operates to deprive the defendants in these consolidated cases—or in any other case—of due process of law. No showing has ever been attempted that Puerto Ricans who are literate in English are prosecution prone, either generally or in regard to the specific offense with which defendants are charged here. There is no showing that any of the defendants are themselves not literate in English, or are members of or associated with any class or group which is precluded from jury service by the English language require-

14. Thiel v. Southern Pacific Company, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 and Ballard v. United States, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 involved exclusions which were held to comprise violations of 28 U.S.C. § 1861 (one of the two statutes which requires the exclusion complained of here) rather than constitutional violations.

ments. And even had such a showing been made, there is no evidence that there exists against any class or group in Puerto Rico the same type of bias or invidious discrimination which has unfortunately existed against Negroes in certain parts of the United States, and which the Supreme Court found in *Hernandez* existed against persons of Mexican descent. The only evidence in the record on the subject of prejudice is the generalized and unspecific testimony of defendants' expert witness that an individual's "perceptions," arising from his socio-economic class, sex, education, or ability to speak English, can affect, without his realizing it, his impartiality as a juror. The Court finds this testimony to be even more "tentative and fragmentary" and "lacking in the sort of factual information that would assist the Court" than was the similar evidence on the subject of prosecution proneness adduced in *Witherspoon*. See 391 U.S. at 517 and n. 11 at 518, 88 S.Ct. at 1775, 20 L.Ed.2d at 782.[15]

## B. *Validity of Jury Selection Procedures*

Defendants additionally contend that, irrespective of the constitutionality of the English language requirements, the jury list was not compiled in accordance with currently applicable law. A lengthy evidentiary hearing was held on this point, at which both Miss Carmen A. Carreras, the present court clerk, and Miss Mary Aguayo, who was clerk until July, 1964, testified concerning the methods by which the list was compiled. From their testimony, the following facts appear:

At the time of the drawing of the grand jury which indicted defendants, the active jury list for this District (using the term "jury list" to mean those names actually in the jury box plus those names held in reserve for inclusion in the jury box when needed) consisted of 853 names. Of that total, somewhat less than 300 names were placed thereon by the Commissioner and Miss Carreras. The remainder (approximately two-thirds of the total) were placed thereon by the Commissioner and Miss Aguayo. The primary method used by Miss Aguayo to obtain names of potential jurors was to write to companies and organizations listed in the yellow pages of the telephone books, requesting that they furnish her with a list of their employees or members who spoke English. Among the organizations canvassed by her were labor unions and women's clubs, and among the companies were the large sugar corporations maintaining plantations in Puerto Rico, and factories, including those which employ primarily women. Questionnaires were then sent to all persons whose names were furnished by these sources. Additionally, Miss Aguayo would ask jurors to give her the names of their wives and daughters, examine the lists of newly naturalized citizens and send them questionnaires, and—in a special effort to obtain jurors from the working class—personally canvass any members of that class, both male and female, whom she encountered and who appeared to possess a knowledge of the English language. She would also ask the latter group of persons to recommend their friends and associates. She found, universally, that the persons whom she personally approached, as well as their friends and associates, knew sufficient English to perform their jobs but not sufficient English to understand proceedings in court. She nevertheless continued these personal efforts until the end of her tenure. The primary method used by Miss Carreras was to select

---

15. It should be noted that while this opinion was in preparation, the Court of Appeals for this Circuit rejected, on the authority of its earlier opinion in Miranda v. United States, supra, 255 F.2d 9, and the earlier opinion of this court in United States v. Mirabal Carrion, 140 F.Supp. 226 (D.P.R., 1956), the contention that "the requirement of English-speaking juries is unconstitutional in that it constitutes improper discrimination." Carpintero v. United States, 1 Cir., 398 F.2d 488, July 16, 1968.

names from the Polk's Directories for Metropolitan San Juan and Ponce, the so-called "Island" telephone book, which includes towns and cities other than those comprised in the San Juan Metropolitan Area (and, before she obtained copies of the Polk's Directories, the Metropolitan San Juan telephone book), and send questionnaires thereto. She would select a few names from each page, using no systematized formula to determine which names to select. It was her estimate that she had sent out approximately nine hundred questionnaires since becoming clerk.

Miss Carreras was also subjected to an extensive and painstaking examination concerning the determinations made by the Commissioner and herself from the face of returned questionnaires as to qualifications, excuses, etc. From this examination, it appears that she and the Commissioner applied only the statutory qualifications, and did not set any additional standards of their own. All persons who asserted on their questionnaires sufficient knowledge of the English language were accepted as meeting the statutory language requirements. Some individuals who disclaimed ability in English were nevertheless also found qualified (it being left to the Court to make the final determination on *voir dire*) if other information appearing on the questionnaire (such as occupation) made a knowledge of English appear likely. Occupation was considered only to the extent that it indicated that the person returning the questionnaire might know sufficient English despite his disclaimers. Pursuant to the oral instructions of former Judge Ruiz Nazario, all teachers were excused from jury service on the ground of hardship. All other proffered hardship excuses were evaluated by Miss Carreras and the Commissioner on an individual basis. There were only five instances in which an individual (otherwise qualified and not exempt by statute) who did not assert an excuse was not placed on the jury list. Two of the persons involved were teachers, and a third was a croupier who was left off because he worked nights and jury service was thus thought to be a hardship for him. The other two had been convicted of felonies. Miss Carreras did not realize that they were disqualified only if their civil rights had not been restored by pardon or amnesty and hence rejected them without further inquiry.

Defendants do not claim that any cognizable classes or groups qualified for jury service were deliberately excluded, and the Court specifically finds that the jury officials here engaged in no systematic and intentional exclusions, either in their initial selection of the persons to whom questionnaires were to be sent or in their evaluation of returned questionnaires. What defendants—relying primarily upon Rabinowitz v. United States, 366 F.2d 34 (C.A. 5, 1966)— urge instead is that, irrespective of the jury officials' intent, they failed to fulfill their duty of taking affirmative measures to insure that the jury list comprised a fair cross-section of the Puerto Rican community. The proof which they offered, through the testimony and affidavits of Dr. Howard R. Stanton, professor of social planning at the University of Puerto Rico, is that the list does not reflect the Puerto Rican population with statistical accuracy in regard to age, sex, residence and occupation, and more particularly that it contains substantial overrepresentation of members of what they designate as the urban white collar class and a substantial underrepresentation of members of the urban and rural working classes.

Before considering defendants' contention and supporting evidence, it is necessary to note a distinction between a jury challenge which is based upon constitutional grounds and one which invokes a court's supervisory jurisdiction over the administration of justice in federal courts. As set forth earlier in this opinion, the Constitution guarantees no more than the right to a fair trial by an unbiased and impartial tribunal, and hence a litigant raising a constitutional challenge must

establish that his right to such has been prejudiced by the exclusion of which he complains. A litigant invoking supervisory jurisdiction, however, need establish only "a departure from the scheme of jury selection which Congress adopted." Ballard v. United States, 329 U.S. 187, 193, 67 S.Ct. 261, 264, 91 L.Ed. 181; see also Thiel v. Southern Pacific Company, 328 U.S. 217, 222–223, 66 S. Ct. 984, 90 L.Ed. 1181. Thus, in one respect, a "supervisory" challenge is broader than a constitutional one, since a litigant need not show that the alleged exclusion specifically prejudices him; he establishes the necessary prejudice merely by showing that his case had been submitted to a jury which has been convened "in disregard of the prescribed standards of jury selection." Ballard v. United States, supra, 329 U.S. at 195, 67 S.Ct. at 265. In another respect, however, it is narrower, since a court may override a statute only on constitutional grounds; it cannot apply its supervisory powers to achieve a result which is contrary to that which Congress has commanded.

■ Here, Congress has ordained that jurors for this court (as for every other federal court) be selected only from among those who understand and are literate in English. This Court has found that requirement to be constitutional. Defendants are thus left only with a "supervisory" challenge. They therefore cannot complain because the jury list does not reflect a cross-section of the *total* Puerto Rican population, since Congress has entitled them to no more than a jury drawn from that segment of the population which meets the language qualifications. The statistical evidence which they offered, however, did not purport to set forth the age,

sex, residence and occupational divisions of the qualified segment of the population, and, in fact, their expert witness acknowledged that no data exists in this regard. Thus, even were they correct in their premise that "the prescribed standards of jury selection" require that statistically accurate cross-sections be achieved in compiling jury lists, their challenge would still fail because they did not demonstrate that the eligible segment of the Puerto Rican population is not represented on this list with statistical accuracy. See United States v. Hunt, 265 F.Supp. 178, 190–191 (W.D. Tex.,1967); United States v. Brown, 281 F.Supp. 31, 37 (E.D.La.,1968).[16]

■ Defendants, through their expert, did attempt to prove that in any event the list was cross-sectionally defective because ninety percent of the persons on it (and ninety-five percent of the employed persons) were members of the urban white collar class, while that class provides no more than fifty percent of the eligible population. The witness based his conclusion as to the latter figure upon the premise that only fifty percent of those who reported to the census an ability to speak English were members of the white collar class, and that this proportion would not vary significantly no matter what level of English comprehension were used as a standard. The Court finds this testimony unconvincing. The census enumeration includes as English speakers all persons who "reported that they could make themselves understood in English," which is hardly a sufficient level of ability to render adequate service as a juror in trials conducted in that language. The witness' credibility was severely weakened both by his admission that he is not an expert in "levels of

---

16. It is well established that a litigant who challenges the regularity of the jury selection process has the burden of establishing, by a "clear showing," all of the elements necessary to sustain his complaint. United States v. Mirabal Carrión, 140 F.Supp. 226 (D.P.R., 1956); see also Glasser v. United States, 315 U.S. 60, 87, 62 S.Ct. 457, 86 L.Ed. 680; Frazier v. United States, 335 U.S. 497, 503, 69 S.Ct. 201, 93 L.Ed. 187; Fay v. People of State of New York, supra, 332 U.S. at 285, 67 S.Ct. 1613; Hernandez v. State of Texas, supra, 347 U.S. at 479, 74 S.Ct. 667.

adequacy in speaking a foreign language" and by his unwillingness on cross-examination to agree to any feasible definition of the degree of language ability necessary to meet the statutory requirements. Moreover, his testimony did not take literacy into account. Census figures indicate that half the adult population of Puerto Rico is functionally illiterate, even in Spanish.[17] It is obvious that white collar workers, almost without exception, are going to be considerably more than functionally literate. They could hardly hold their positions if they were not. Thus, the fifty percent of the population who are not functionally literate, as well as those additional persons who just barely achieve that status, are going to be found in the urban and rural working classes. While some in those classes may be able to "make themselves understood in English," since those of them who are literate in Spanish comprise only a minority, it follows that those who are literate in English comprise an even smaller minority. This conclusion is fortified by Miss Aguayo's testimony that, in her personal approaches to working class people, she found that without exception they knew only enough English to perform their jobs but not sufficient English to serve as jurors.

The Court of Appeals for this Circuit held in an earlier case involving jury selection procedures in this court that, "although few wage earners are selected for federal jury service, the reason is that few in that class have sufficient knowledge of the English language to meet the statutory requirement for such service." Quiñones v. United States,

161 F.2d 79, 81 (C.A. 1, 1947), certiorari denied, 331 U.S. 833, 67 S.Ct. 1513, 91 L.Ed. 1846. There is no credible evidence in the record here to indicate that the situation is any different today.

■ Moreover, even if defendants had successfully proved that the jury list does not reflect the eligible population in this district with statistical accuracy, their challenge would still not be sustainable. The requirement that juries be "drawn from a cross-section of the community," as the Supreme Court explained in *Thiel*, 328 U.S. at 220, 66 S.Ct. at 985:

> * * * does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials *without systematic and intentional exclusion* of any of these groups (emphasis added).

Similarly, in *Ballard* the Court held that it was "the *purposeful and systematic exclusion* of women from the panel" which constituted the "departure from the scheme of jury selection which Congress adopted" (emphasis added). 329 U.S. at 193, 67 S.Ct. at 264. The cross-sectional requirement of *Thiel* and *Ballard* has been construed by the Supreme Court, the Court of Appeals for this Circuit, and other circuit and district courts, as extending no further than to forbid systematic and intentional exclusions. Frazier v. United States, 335 U.S. 497, 504, 69 S.Ct. 201, 93 L.Ed.

17. "Functional illiteracy" is defined as less than five years of schooling. Current Population Reports: Estimate of Illiteracy by States, 1960—Series P–23, No. 8, p. 1; see also Rabinowitz v. United States, supra, 366 F.2d at 54–55; id. at 91 (Bell, J., dissenting); United States v. Brown, supra, 281 F.Supp. at 35; United States v. Hunt, supra, 265 F.Supp. at 191; 42 U.S.C. § 1973b(e)(2), which permits Puerto Rican residents of the states to vote in elections there, despite inability to speak or understand English, if they can establish their literacy in Spanish by showing that they have "successfully completed the sixth primary grade in a public school in, or a private school accredited by * * * the Commonwealth of Puerto Rico." The 1960 census disclose that the median years of schooling completed by Puerto Ricans over the age of twenty-five is 4.5. The figure is 4.8 for men and 4.3 for women.

187; Gorin v. United States, 313 F.2d 641, 644 (C.A. 1, 1963), certiorari denied, 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052; Young v. United States, 94 U.S.App.D.C. 54, 212 F.2d 236, 238 (1954), certiorari denied, 347 U.S. 1015, 74 S.Ct. 870, 98 L.Ed. 1137; United States v. Clancy, 276 F.2d 617, 632 (C.A. 7, 1960), reversed on other grounds, 365 U.S. 312, 81 S.Ct. 645, 5 L.Ed.2d 574; Dow v. Carnegie-Illinois Steel Corporation, 224 F.2d 414, 423, (C.A. 3, 1955), certiorari denied, 350 U.S. 971, 76 S.Ct. 442, 100 L.Ed. 842; United States v. Dennis, 183 F.2d 201, 219, 223 (C.A. 2, 1950), affirmed, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137; United States v. Local 36 of International Fishermen & Allied Workers, 70 F. Supp. 782, 790 (S.D.Cal., 1947), affirmed, 177 F.2d 320 (C.A. 9, 1949), certiorari denied, 339 U.S. 947, 70 S.Ct. 801, 94 L.Ed. 1361; United States v. Greenberg, 200 F.Supp. 382, 393 (S.D.N.Y., 1961); United States v. Brandt, 139 F. Supp. 349, 354 (N.D. Ohio, 1955). As one district court explained, "absent intent or design, *even complete and total exclusion* of specific groups, classes, races and areas from the Grand Jury list does not invalidate the Grand Jury" (emphasis added). United States v. Fujimoto, 102 F.Supp. 890, 895 (D.Haw., 1952).

Nor are jury officials presently required to use any particular source to obtain the names of prospective jurors. To the contrary, they are accorded "a wide discretion." United States v. Brandt, supra, 139 F.Supp. at 360; see also United States v. Dennis, supra, 183 F.2d at 217. Defendants' expert witness testified that a better cross-section could have been obtained had Miss Carreras used voter registration lists, utility subscribers' lists, or the random samples already compiled by the commonwealth Departments of Labor or Health, instead of the Polk's Directories and the telephone books. But "[t]he Jury Commissioners in the federal courts are not required either by statute or by judicial decisions to select names of prospective jurors *from any particular list* such as voters, registration or taxpayers lists, as may be required by the laws of some States" (emphasis added). United States v. Frankfeld, 101 F.Supp. 449, 452 (D.Md., 1951). Defendants also complain that Miss Aguayo used a "key man" system, which they contend is unlawful. Technically speaking, she did not. The "key man" system involves the request for *selective* recommendations from the key men, while Miss Aguayo requested to be supplied with lists of *all* English-speaking employees or members by the companies and organizations which she contacted. In any event, use of the system is not *per se* unlawful. Scales v. United States, 367 U.S. 203, 259, 81 S.Ct. 1469, 6 L.Ed. 2d 782, affirming 260 F.2d 21, 44–46 (C.A. 4, 1958); United States v. Hoffa, 349 F.2d 20, 29–30 (C.A. 6, 1965), affirmed, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374; Padgett v. Buxton-Smith Mercantile Company, 283 F.2d 597, 598 (C.A. 10, 1960), certiorari denied, 365 U.S. 828, 81 S.Ct. 713, 5 L.Ed.2d 705; Dow v. Carnegie-Illinois Steel Corporation, supra, 224 F.2d at 427; United States v. Cohen, 275 F.Supp. 724, 736 (D.Md., 1967); United States v. Hunt, supra, 265 F.Supp. at 185. To be sure, the new Jury Selection and Service Act of 1968 (P.L. 90–274, 82 Stat. 53) provides jury officials with specific directions as to the sources they must use to obtain the names of potential jurors and the methods they must follow in abstracting names from those sources, and is intended, among other purposes, to forbid the future use of the "key man" system. See H.Rep.No. 1076, 90th Cong., 2d Sess., p. 4. But the new legislation was enacted precisely because "existing statutory vagueness which is a substantial source of confusion in jury selection systems today" leaves jury officials without directions and free to use any sources and procedures which they deem proper. Id., p. 3, U.S. Code Cong. & Admin. News 1968, p. 749; see also S.Rep.No. 891, 90th Cong., 1st Sess., p. 10. Enactment of the new

statute, which does not take effect until December 22, 1968, indicates that jury selection procedures in this court (as in many other federal courts) are subject to improvement. Contrary to defendants' assertion, however, it does not at all indicate that the procedures here or elsewhere are unlawful under present law. See United States v. Cohen, supra, 275 F.Supp. at 737 and 739.

Defendants' difficulty is that they erroneously assume the cross-sectional requirement to mean that a jury list must comprise a statistical cross-section derived from a random sampling, in the sense that sociologists and statisticians use those terms. The law makes no such demand. See United States v. Dennis, supra, 183 F.2d at 224. Courts have been unanimous in holding that proportional representation is neither a necessary nor a proper goal of jury selection. Cassell v. State of Texas, 339 U.S. 282, 286, 70 S.Ct. 629, 94 L.Ed. 839; Hoyt v. State of Florida, supra, 368 U.S. at 69, 82 S.Ct. 159; Brown v. Allen, supra, 344 U.S. at 471, 73 S.Ct. 397; Fay v. People of State of New York, supra, 332 U.S. at 291, 67 S.Ct. 1613; Gorin v. United States, supra, 313 F.2d at 644; Chance v. United States, 322 F.2d 201, 204 (C.A. 5, 1963), certiorari denied, 379 U.S. 823, 85 S.Ct. 47, 13 L.Ed.2d 34; United States v. Henderson, 298 F.2d 522 (C.A. 7, 1962), certiorari denied, 369 U.S. 878, 82 S.Ct. 1150, 8 L.Ed.2d 280; Dow v. Carnegie-Illinois Steel Corporation, supra, 224 F.2d at 428; United States v. Flynn, 216 F.2d 354, 388 (C.A. 2, 1954), certiorari denied, 348 U.S. 909, 75 S.Ct. 295, 99 L.Ed. 713; United States v. Dennis, supra, 183 F.2d at 223; United States v. Greenberg, supra, 200 F.Supp. at 392; United States v. Romano, 191 F.Supp. 772, 774–775 (D.C.Conn. 1961); United States v. Foster, 83 F.Supp. 197, 208 (S.D.N.Y., 1949); United States v. Brown, supra, 281 F.Supp. at 38–39; United States v. Brandt, supra, 139 F. Supp. at 354–355; United States v. Fujimoto, supra, 102 F.Supp. at 894. In its most recent word on the subject,

the Supreme Court cautioned in Swain v. State of Alabama, 380 U.S. 202, 208, 85 S.Ct. 824, 829, 13 L.Ed.2d 759:

> Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group. "Obviously the number of races and nationalities appearing in the ancestry of our citizens would make it impossible to meet a requirement of proportional representation."

Nor will proportional representation or statistically exact random sampling be required by the new jury act. The Senate Committee on the Judiciary has stated that the selection system established by its legislation will "not be entirely random," since "[a]t various points in the process, candidates for jury service may be eliminated if they fall short of the requirements for service specifically enumerated in" the act, and that even the initial selection process which the act provides "does not insist upon randomness in the sense in which that term might be understood by statisticians." S.Rep.No. 891, op. cit. 16, n. 9. Both that committee and the House Committee on the Judiciary have explained that the act does not require the qualified jury wheel (the equivalent of the present jury list) to be comprised of "groups that accurately mirror community makeup." Id. at 17; H.Rep. 1076, op. cit. 5. Thus, even under the new legislation, defendants would not be entitled to the type of jury list which they assert they are entitled to now.

In evaluating the validity of a jury selection procedure it must be kept in mind that a "cross-section," in contemplation of law, and a "cross-section," as the term is used in sociology, are discrete concepts invoked to serve totally dissimilar functions. As the testimony of defendants' expert disclosed, the function of a sociologist is "descriptive"; his need is for a cross-section of the *characteristics* of the community as a corporate entity in order that he may "describe" the proportions in which an unknown characteristic which he wishes

to ascertain are distributed. He has no need for a cross-section of the actual individuals composing the community. with their infinite variety of combinations of characteristics, since the data which he seeks concerns the "average" individual but not specific corporeal individuals. The law, however, does not convene juries to conduct surveys and "describe" the community. Its need is to have judgments made on the rights of litigants. These judgments cannot be made by incorporeal "characteristics"; they require specific corporeal individuals, each with his own peculiar combination of characteristics, who made their decision only after they have heard the evidence. A broad cross-section is required as a source for jurors in order that the jury not be "the organ of any special group or class." Glasser v. United States, 315 U.S. 60, 86, 62 S.Ct. 457, 472, 86 L.Ed. 680. But since a jury list which comprises an accurate cross-section of all of the corporeal individuals in the community, with all of their permutations of characteristics, is as defendants' expert acknowledged, impossible of attainment (see also Swain v. State of Alabama, supra, 380 U.S. at 208, 85 S.Ct. 824; United States v. Brown, supra, 281 F.Supp. at 39; United States v. Hunt, supra, 265 F.Supp. at 197), the only feasible requirement for a legal cross-section is that there be no intentional and premeditated exclusions of any qualified cognizable segment of the population.

Defendants assert, however, that the jury list here is, in effect, "the organ of [a] special group or class" because it consists almost entirely of members of what they designate as the "urban white collar" class and has few if any representatives of what they claim to be the other three "important" segments into which Puerto Rican society is divided: the urban working class, the coastal sugar plantation workers, and the *jibaros* or mountain farmers. Their contention does not bear scrutiny. Their classifications are based only on occupation, and take no account of other factors, such as actual income, personal history and family background. They include within the "urban white collar class" a wide range of persons, from the wealthy and powerful to the lowly clerk and secretary, or in other words from the upper class to the lower middle class. Indeed, their expert testified that the median annual income of the "class" is approximately $2,200. This attempted grouping thus can not be considered as only a single class for purposes of determining the adequacy of the jury selection process. Compare United States v. Hunt, supra, 265 F.Supp. at 201. On the other hand, their other three asserted "classes" are in fact merely the working class, trifurcated on the basis of the type and locale of work which its members perform. Indeed, the *jibaros* and sugar plantation workers could be further subdivided, based on such factors as residence in coffee growing or tobacco growing areas, employment by government-owned or private-owned corporations, those who own land, sharecrop or are landless, or upon the size of land holdings. Using defendants' approach, the possibilities are virtually limitless for defining a "class" and finding that it lacks representation on the jury list. Compare United States v. Local 36 of International Fishermen & Allied Workers, supra, 70 F.Supp. at 785–790. Nor is defendants' contention any more persuasive on the basis of their assertion that each of their four "classes" are subject to a separate "tradition," so that the jury list is unrepresentative of three of the four "traditions" which influence thinking in Puerto Rico. As appears from their expert's testimony, each individual is unique in respect to the various traditions by which he is influenced, and his current occupation is merely one of many factors in his total environment and history which shape his attitudes. For example, a white collar worker who arose to his present position from a working class start, whose father was originally a *jibaro*, and who has relatives who are sugar plantation workers, would be influenced by

the traditions of more than one and may be all four "classes." [18] Thus, while the list may perhaps be deficient in persons who, for the limited purpose of conducting a sociological survey, are *statistically classified* as being subject to the *jíbaro,* sugar plantation worker, and urban worker traditions, defendants have failed to establish that *in fact* it is insulated from any of the traditions which influence thinking in Puerto Rico.

The foregoing considerations supporting the lawfulness of the jury selection procedures here are not in any way vitiated by the opinion of the Court of Appeals for the Fifth Circuit in *Rabinowitz.* That court's holding that "[t]he Constitution and laws of the United States place an affirmative duty on the court clerk and the jury commissioner to develop and use a system that will probably result in a fair cross-section of the community being placed on the jury rolls" (366 F.2d at 57) is as far as this Court can ascertain, *sui generis.* It is in clear and direct conflict with the otherwise unanimous rulings, of which note has already been taken, of the Supreme Court and almost every other circuit, including this one, that jury officials are under only the negative duty to practice no intentional discriminations. The case is thus compelling authority only within its own circuit. Compare Pope v. United States, 372 F.2d 710, 724 (C.A. 8, 1967), remanded on other grounds, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317.

A determination of the authoritativeness of the case is unnecessary, however, since it is manifestly inapposite to the facts disclosed in the record here. In *Pope* it was concluded that the case was concerned solely with racial representation on jury lists (372 F.2d at 724), and this Court finds itself in agreement. The Court is impressed with the fact that the government confessed error in *Rabinowitz* to the extent of suggesting that the convictions be reversed because the extreme racial disproportion on the jury list there, combined with the all-white composition of the resultant petit juries, created "a possibility of injustice sufficient to warrant reversal of the trial verdicts." See Supplemental Brief for the United States, Nos. 21256 and 21345, C.A. 5, pp. 40–41. It is also impressed with the fact that the opinion took no notice of a female underrepresentation which the record disclosed was almost as great as the racial one. See Supplemental Brief for the United States, op. cit. 13, n. 7; see also 366 F.2d at 84 (Bell, J., dissenting). The cases upon which the opinion mainly relied were all concerned with *racial* discrimination in jury selection. See 366 F.2d at 57–58. The conclusion is inescapable that, although the opinion was phrased in terms of the use of "grossly inadequate sources" violating "the statutory scheme" (id. at 60; compare Ballard v. United States, supra, 329 U.S. at 193, 67 S.Ct. 261), its real genesis was the constitutional concern for impartial juries. The Court would appear to have concluded that, in parts of the country where racial segregation and its attendant "long history of unhappy relations between the two races"

---

18. Defendants' expert testified that there is not a great deal of occupational mobility in Puerto Rico, and hence that such individuals would be rare. The court does not find this testimony convincing. Census data discloses that between 1950 and 1960 there was almost a sixty percent increase in the number of professional and technical workers while at the same time the number of farm laborers and unpaid family workers decreased by more than eighty percent. See Mintz, Puerto Rico: An Essay in the Definition of a National Cul-

ture, Selected Background Studies Prepared for the United States-Puerto Rico Commission on the Status of Puerto (1966), 339, 378–379. The census also shows that less than ten percent of the residents of San Juan were born in that city and that over fifty percent were born in rural areas. The Court from its own experience can also attest to the accuracy of Professor Mintz's conclusion that "[s]ocial and economic change in the past decade has been extremely rapid and throughgoing * * *." Mintz, op. cit., 378.

976

(Fay v. People of State of New York, supra, 332 U.S. 282, 67 S.Ct. 1624) traditionally have prevailed, the assurance of fair trials for Negroes and those associated with their endeavors[19] is not adequately served by the mere negative injunction against deliberate discrimination in jury selection; rather, positive efforts to extend an opportunity for jury service to Negroes are required. Two district courts within the circuit appear to have arrived at this same interpretation of the command to which they were put by their court of appeals, and as a consequence have held that it is only in the pursuit of a racial cross-section that affirmative efforts are required. See United States v. Tillman, 272 F. Supp. 908, 913 n. 8 (N.D.Ga., 1967); United States v. Brown, supra, 281 F. Supp. at 37.

It is in any event clear that *Rabinowitz* purported neither to require the use of any particular method of jury selection nor to declare unlawful *per se* the "key man" system which the jury officials there had used. The Court of Appeals in a later decision explicitly stated that it had condemned only the improper use of the otherwise lawful "key man" system. Mobley v. United States, 379 F.2d 768, 773 (C.A. 5, 1967). Nor did the opinion purport to require jury lists which comprise statistical cross-sections of the relevant communities. To the contrary, it quoted, as a "caution," the language from *Swain* advising that proportional representation is both unnecessary and impossible of attainment. 366 F.2d at 59. All that the opinion demanded was affirmative efforts to obtain a fair cross-section. Thus, even were this Court to conclude that *Rabinowitz* is controlling upon it and that the opinion's cross-sectional requirements are not limited to racial groups or other groups similarly subject to community prejudice, defendants' challenge here would still have failed of its proof. An evaluation of the adequacy of efforts to obtain a cross-section requires an analysis of the groups who were extended an opportunity for jury service, and not merely the limited analysis which defendants made of the groups actually represented on the list. United States v. Brown, supra, 281 F.Supp. at 37; compare Billingsley v. Clayton, 359 F.2d 13, 23 (C.A. 5, 1966), certiorari denied, 385 U.S. 841, 87 S.Ct. 92, 17 L.Ed.2d 74. Representation on the list itself depends upon factors—e. g., the distribution of those who return their questionnaires, and of those who are unqualified, exempt, or who assert and are entitled to excuses—over which the officials have little effective control. United States v. Brown, supra.

The record here discloses, for example, that Miss Carreras sent out nine hundred questionnaires during her tenure, and yet was able to add only three hundred names to the list. Experience elsewhere shows that a substantially greater proportion of the working class and the less affluent than of the white collar and managerial classes and the more affluent fail to respond to solicitations for jury service, seek to avoid such service, or fail to qualify. Cf. United States v. Flynn, supra, 216 F.2d at 379, 381–383, 386; Billingsley v. Clayton, supra, 359 F.2d at 19–20; United States v. Brown, supra, 281 F.Supp. at 36. So also, the returned questionnaires in the record here disclose that most of those who failed to qualify for jury service because they could not speak or understand English were of the working class, rural residents, or in any event non-residents of San Juan. It is a reasonable assumption that many more persons in those categories who also lack knowledge of English did not bother to return their questionnaires. As far as the record shows, therefore, the persons to whom Miss Carreras sent questionnaires could in fact have comprised an exact cross-section of the total adult population of Puerto Rico; it is only in those who returned their questionnaires and qualified

19. The defendant for whom the case was named was white, but her indictment resulted from her association with the Negro side of a racial dispute. See 366 F.2d at 37.

for jury service that such a cross-section is found to be lacking.

To be sure, in *Rabinowitz* the dispositive disproportion was on the jury list itself. The Court, however, found the disproportion to have been caused by a fatal flaw in the methods used by the officials there: in a segregated society, the officials relied almost exclusively upon white key men and instructed them to apply standards of competency—impermissibly higher, in the court's view, than those required by statute—which tended to minimize their recommendation of Negroes. See 366 F.2d at 41–44, 55; see also Mobley v. United States, supra. No comparable flaw is disclosed in the record here. Miss Carreras used neutral lists, containing the names of men as well as women and working class people as well as of those in white collar or managerial occupations. Miss Aguayo, who compiled two-thirds of the list, solicited names from labor unions and women's clubs (compare United States v. Hunt, supra, 265 F.Supp. at 195; *Rabinowitz* at 366 F.2d 59, n. 61); asked factories and sugar plantations to supply her with the names of their employees, and gave her sources no more than the statutory standard to apply: viz., ability to understand English. In addition, she supplemented this approach, in an affirmative effort to achieve working class representation on the list, with the very type of personal canvass of which the Fifth Circuit approved in *Billingsley*. See 359 F.2d at 19, 23. Thus the officials here had done all that even *Rabinowitz* would require them to do.

Defendants assert, also in reliance upon *Rabinowitz*, an additional ground upon which they claim the jury list was compiled unlawfully: that Miss Carreras and the commissioner exceeded the scope of their statutory discretion and made determinations which were properly the function of the court. More particularly, they complain that the officials made capricious evaluations in determining whether the language requirements were met by potential jurors and whether excuses for hardship should have been granted; that hardship excuses were granted without obtaining information additional to that which appeared on the questionnaires, and that teachers and others were automatically excused despite the lack of a formal order from the Court to that effect. They also cite as specific abuses the exclusion of those convicted of felonies without inquiry as to whether they had been amnestied, as well as the grant of an unsolicited hardship excuse to a croupier.

This branch of defendants' challenge appears to assume that the jury officials have only ministerial functions under the current statutes. The law is otherwise. When the new jury legislation takes effect, the written plan for jury selection which each court must adopt will be required to specify, with supporting findings by the Court, the groups and occupational classes whose members will be either exempt or entitled to be excused upon individual request. Any additional individual exclusions or hardship excuses will be made or granted only by the court after the individuals have been actually summoned for jury service. Under current law, however, the duty of the jury commission "is to invoke its sound judgment and discretion in determining what persons should be called for jury service." United States v. Ware, 237 F.Supp. 849, 851 (D.C.D.C., 1964), affirmed 123 U.S.App.D.C. 34, 356 F.2d 787 (1965), certiorari denied, 383 U.S. 919, 86 S.Ct. 914, 15 L.Ed.2d 673. Among the determinations within the broad discretion granted to the commission is whether requested hardship excuses should be granted (United States v. Kelly, 349 F.2d 720, 778–779 (C.A.2, 1965), certiorari denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544; United States v. Flynn, supra, 216 F.2d at 387) and whether statutory qualifications are met in individual cases. United States v. Flynn, supra; United States v. Henderson, supra, 298 F.2d at 525; see also United States v. Brandt, 139 F.Supp. 362, 365 (N.D.Ohio, 1955). District judges may also direct the commission, as did former Judge Ruiz Nazario of this

court, to exclude or excuse occupational groups in the public interest, without the necessity of reducing his direction to a written order. United States v. Van Allen, 208 F.Supp. 331, 337 (S.D.N.Y., 1962), affirmed sub nom. United States v. Kelly, supra; see also United States v. Cohen, supra, 275 F.Supp. at 730. One of the reasons, in fact, for the enactment of the new jury legislation is that current law does not specify "the bases upon which otherwise qualified jurors should be eliminated from jury service." S.Rep. No. 891, op. cit. 10.

 For all of their extensive and painstaking examination of Miss Carreras, defendants developed no more than that, in retrospect, there was some inconsistency in the determinations which she and the Commissioner made in individual cases, and that perhaps some persons were left off the list who should have been placed thereon. This showing can hardly be deemed sufficient to overcome the presumption of regularity which attends the decisions and actions of jury officials. See United States v. Austrew, 190 F.Supp. 632, 634 (D.Md., 1961). The most that could be shown was "slight and harmless deviation from the prescribed procedure" which would warrant dismissal of these indictments only if defendants had shown, as they did not, that they were specifically prejudiced thereby. United States v. Brandt, 139 F.Supp. 349, 361 (N.D.Ohio, 1955). While some of the individual rejections reflected in the record may possibly comprise technical irregularities, they would invalidate the jury list only if they evidenced the intentional exclusion of the cognizable group. Ware v. United States, 123 U.S. App.D.C. 34, 356 F.2d 787, 790–791 (1965), certiorari denied, 383 U.S. 919, 86 S.Ct. 914, 15 L.Ed.2d 673. Clearly they do not. The individuals whose ex-

cuses for hardship or illness defendants question were for the most part members of the same white collar and managerial classes of whose preponderance on the jury list defendants complain.[20] While one excused individual was a cane weigher, his case alone can hardly be thought to evidence an intentional exclusion of the *entire* rural working class or a substantial part thereof. It is similarly difficult to construct a theory of purposeful exclusion because one croupier was granted a gratuitous compassionate excuse. And as *Ware* makes plain, Miss Carreras' peremptory rejection of two convicted felons due to misapprehension of the applicable statutory provision does not evidence "purposeful discrimination" (356 F.2d at 790), even if the highly dubious assumption were indulged that amnestied felons constitute a "cognizable group." Id. at 791.

This Court does not read *Rabinowitz* to sustain the proposition that the officials here abused their discretion. The pronouncement in that case that jury officials have no discretion to impose qualifications additional to the statutory ones is directly contrary to such prior authorities as *Henderson, Flynn, Kelly* and *Ware,* and, moreover, commanded the support of only a plurality of the participating judges. See 366 F.2d at 72. Its authority is therefore open to question even within the circuit (see United States v. Hunt, supra, 265 F.Supp. at 185–187), and not compelling without. See Pope v. United States, supra, 372 F. 2d at 723; United States v. Duke, 263 F.Supp. 828, 836 (S.D.Ind., 1967). Moreover, in the opinion of this Court, the pronouncement was inextricably intertwined with the underlying concern of the court of appeals for impartial juries in cases arising out of a racial conflict; the standards used by the jury officials there

---

20. There was no requirement that the jury officials obtain information additional to that appearing on the questionnaires in order to evaluate assertions of hardship or illness. See United States v. Henderson, 298 F.2d at 525. Any such requirement would have been impracticable and oppressive. Obtaining names for the jury list is only one of many functions performed by the clerk and her deputies, who are kept so busy with all of their duties that they consistently work overtime and often work weekends.

were condemned because they "eliminated many Negroes otherwise eligible to serve." 366 F.2d at 51. In any event, the condemned discretion involved the creation of "broad and vague subjective tests"—such as "good character, intelligence and ability to 'understand the cases that are tried in court' "—as additional qualifications which kept prospective jurors off the list. Ibid. The officials here, to the contrary, accepted as qualified all who asserted understanding of English, and used their discretion only to place additional persons on the list where such persons' self-assertions of lack of understanding of the English language was open to question.

One district court has said of the presumption of regularity which clothes the acts and conduct of jury officials that it is "a rebuttable yet very substantial presumption. It does not easily fall apart when attacked by a shotgun loaded with statistics." United States v. Fujimoto, supra, 102 F.Supp. at 894–895. This Court would add that it also does not easily fall apart when attacked by an extensive and intensive probe of the recesses of jury officials' memories in order to make them justify and correlate for consistency every individual determination which they have made from the commencement of their tenure.

## II. SUBSTANTIVE VALIDITY OF THE INDICTMENTS

■ Defendants' attack upon the substantive validity of their indictments proceeds upon the premise that the Selective Service Act is not intended, and cannot constitutionally, apply to Puerto Ricans because citizens of the Commonwealth lack voting representation in Congress and do not participate in the election of the President.[21] This contention

was rejected long ago by the Court of Appeals for this Circuit. Ruiz Alicea v. United States, 180 F.2d 870 (C.A.1, 1950). Defendants have offered nothing to cause this Court to question the authority of that case.

Their contention that the act is not intended to apply to Puerto Ricans is easily disposed of. The act makes "every male citizen of the United States" between the requisite ages liable for training and service in the armed forces. 50 U.S.C. App. § 454(a). Puerto Ricans are citizens of the United States. 8 U.S.C. § 1402. Lest there be any question of Congressional intent, the act defines "United States," when used in "a geographical sense," to include "the several States, the District of Columbia, Puerto Rico, the Virgin Islands, and Guam" (50 U.S.C. App. § 466(b)), and, more importantly, specifies the manner in which quotas are to be determined "for each State, Territory, possession, and the District of Columbia." 50 U.S.C. App. § 455(b).[22] Moreover, the act applies to permanently resident aliens, regardless of whether they apply for citizenship. 50 U.S.C. App. § 454(a) Congress could hardly have intended to have made aliens subject to military service and at the same time exempted citizens merely because their present place of residence deprives them of the national franchise.

■ Defendants' constitutional contention causes no greater problem. Citizens of Puerto Rico lack national political participation for the same reason that such participation is withheld from citizens of the territories and (with the limited exception provided by the Twenty-third Amendment) the District of Columbia: the Constitution provides for participation in the national political

21. Defendants also suggested the general unconstitutionality of the Selective Service Act. That contention was laid to rest, however, in United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L. Ed.2d 672, 682.

22. When § 455(b) was first enacted in 1948, Puerto Rico was still a territory. The fact that the section was not there-

after amended when Puerto Rico became a commonwealth in no way implies a *sub silentio* intent on the part of Congress to relieve Puerto Ricans of a duty imposed on all other citizens. On the contrary, not having expressed in the compact or elsewhere the will to change the existing situation, the intent must have been to maintain the same.

process only through the states. Art. I, §§ 2, 3, & 4, cl. 1; Art. II, § 1, cls. 2 & 3; Twelfth Amendment; Seventeenth Amendment. These constitutional provisions cannot be said, in contemplation of law, to diminish the national citizenship status of citizens of the Commonwealth, the District of Columbia, or the territories. The Constitution recognizes no "second-class citizenship." Schneider v. Rusk, 377 U.S. 163, 169, 84 S.Ct. 1187, 12 L.Ed.2d 218.

Defendants' error lies in assuming that the right to vote is an essential right of citizenship. The proposition is beguiling, but it will not stand analysis. The only absolute and unqualified right of citizenship is to residence within the territorial boundaries of the United States; a citizen cannot be either deported or denied reentry. The Supreme Court explained in Balzac v. People of Porto Rico, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627, that the major advantage (aside from "more certain protection against the world," id. at 311, 42 S.Ct. at 348) which Puerto Ricans acquired when they were made United States citizens while Filipinos were not was that they, as individuals, obtained the absolute right to enter continental United States and become citizens of any state while Filipinos could do so only by going through the process of naturalization. See id. at 308, 42 S.Ct. 343. The right to vote is not in terms granted to citizens by the Constitution; to the contrary, the matter is left to the states. Art. I, § 2; Seventeenth Amendment. Citizenship may be made a qualification for voting, as it is, e. g., for holding office or being a juror (but not necessarily so, since the Constitution does not enjoin the states to limit the franchise to citizens). Citizens who are otherwise qualified cannot be discriminatorily denied the franchise because of race, sex, or ability to pay a fee.

Fifteenth Amendment; Nineteenth Amendment; Twenty-fourth Amendment; Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169. The reapportionment cases have established that the Constitution forbids a state to "debase" either the national or the local vote of a portion of its qualified citizenry by malapportionment. See, e. g., Wesberry v. Sanders, 376 U.S. 1, 5–6, 84 S.Ct. 526, 11 L.Ed.2d 481. But the Constitution does not make the franchise *per se* a right of citizenship. Minor v. Happersett, 21 Wall. 162, 22 L.Ed. 627. If it did, minors, Americans residing abroad (who may vote only if the state of which they are concurrently citizens permits absentee ballots) and, as in *Minor*, women prior to the adoption of the Nineteenth Amendment could not be considered citizens, and those who have changed their residence would have to be deemed to have lost their citizenship until such time as they acquired the requisite residence tenure in their new place of domicile

Since the franchise is not *per se* a right of citizenship, it follows that it is not a precondition to imposition of duties of citizenship. It has, in fact, been specifically held that the denial to minors of the franchise does not free them of their obligation for military service or bar their prosecution when they refuse to serve. George v. United States, 196 F.2d 445, 446, 454–455 (C.A.9, 1952), certiorari denied, 344 U.S. 843, 73 S.Ct. 58, 97 L.Ed. 656. If minors, who cannot vote at all (except in certain states), are constitutionally subject to military service, it follows even more clearly that the Constitution is no bar to imposing military service upon Puerto Ricans, who have full local self-governing and lack national political participation only because the Constitution makes no provision for them to have it [23] unless they move to the Mainland and establish residence there.

23. Defendants argue that the principle of "no taxation without representation" implies as well as no military service without representation. They cite only a slogan, however, and not a constitutional principle. Citizens of some territories and the District of Columbia are taxed federally without representation, and at the present moment citizens of the District are taxed locally without representa-

Apparently misunderstanding the relationship of the compact to the Selective Service Act's applicability to Puerto Rico, defendants argue that there is no compact; that if the compact exists it has no relevance to selective service; and that applying selective service to Puerto Rico violates the compact, if it exists. Even if they were correct in their initial assertion, their argument against the indictments would not be advanced. The liability of Puerto Ricans for military service arises not from the compact but from their United States citizenship, which antedates the compact (although it was specifically reaffirmed and made unilaterally irrevocable by that document). If defendants were correct and there were no compact, which is not true, Puerto Ricans would nevertheless remain American citizens and hence subject to military service.

It is clear, however, that the compact does exist as a binding agreement, irrevocable unilaterally between the people of Puerto Rico and the Congress of the United States, transforming Puerto Rico's status from territory to commonwealth, or *Estado Libre Asociado*.[24] The best evidence that this is so lies in the Commonwealth Constitution. Territories are governed by organic acts, enacted by Congress, unilaterally amendable by Congress, unilaterally revocable by Congress. Puerto Rico, however, is governed by a constitution adopted by the vote of its people. While the constitution was submitted initially to Congress for approval (as in the case of the initial constitutions of new states) a proposal that subsequent amendments thereto must be approved by Congress was deleted from the enabling resolution (S. J. Res. 151) at the insistence of the government of Puerto Rico. 98 Cong.Rec. 7840 et seq., 8306–07, 8618–19. A proposal that the enabling resolution state that Congress retained its powers over Puerto Rico under the Territorial Clause of the Constitution was also rejected. Id. at 6183 et seq. In short, in respect to domestic authority, the status of the Commonwealth essentially parallels that of the states. It is only in regard to national political participation, voluntarily waived by the Puerto Rican people, that the status is different.

Since the people of Puerto Rico, in accepting the compact, rejected both independence and statehood (and reaffirmed their choice in the 1967 plebiscite, where the independence and statehood alternatives, being specifically presented, were specifically rejected), it cannot be said that the imposition of military service without national political participation comprises an invidious discrimination forbidden by the Fifth Amendment. By rejecting independence and accepting a free association with the United States and the United States citizenship, the people of Puerto Rico accepted the duties of citizenship, including liability for military service. By rejecting statehood and accepting the commonwealth status, they disclaimed any counterdemand for par-

tion as well. Puerto Rico's freedom from federal taxation is not constitutionally derived, but arises from the compact agreement that the Commonwealth shall have fiscal autonomy.

24. To say that the compact is irrevocable unilaterally is not to say that all of its detailed provisions are. It is only the essential provisions which cannot be revoked by one party acting alone: i. e., the provisions which establish Puerto Rico's status as a commonwealth with plenary domestic authority, its association with the United States, the United States citizenship of its people, and such favorable concessions as it fiscal autonomy. There are peripheral provisions,

however, which were retained in the Federal Relations Act because there was no place else to put them : e. g., the provisions governing procedures in this court. In regard to the Court, the only essential element of the Compact is that the agreement to associate with the United States provides the present basis for its existence. But since the Court is a federal one, it is properly governed by rules established by Congress alone. Hence, the fact that Congress has repealed 48 U.S.C. § 867 (§ 44 of the Federal Relations Act) in favor of uniform rules for jury selection throughout the federal judicial system does not affect the inviolability of the compact.

ticipation in the national political process. Rather, they determine that at this stage in Puerto Rico's development, commonwealth status, with its attendant fiscal autonomy, would serve their interests better than the national political participation they would gain by statehood.[25]

Defendants argue, however, that the preamble to P.L. 600 recognizes "the right of self-government of the people of Puerto Rico," and that under the circumstances the Selective Service Act is inconsistent with that right and thus was repealed, in respect to Puerto Rico, by its section 6. They confuse self-government with either statehood or independence. "Self-government," in the context used, means plenary domestic political authority as a matter of right, rather than grace. This the Compact establishes. It is only statehood, however, which permits full participation in the process by which uniform national laws are enacted, and only independence which would allow Puerto Rico to determine for itself, with the exclusion of all other, whether compulsory military service would be imposed upon its citizens. By consenting to the Compact, the people of Puerto Rico have rejected both alternatives. It follows that the application here of the Selective Service Act is thoroughly consistent with the Compact and the will of the people of Puerto Rico.

■■■ Defendants also argue that the cession of Puerto Rico to the United States by the Treaty of Paris (30 Stat. 1754) was illegal under Spanish law.

They do not ask this Court to declare that the cession was unlawful *in toto* and that Puerto Rico is therefore still a possession of Spain. Rather, they ask a declaration that, because of its illegality, the Selective Service Act can have no application here. It is difficult, however, to perceive how the cession could be void for one limited purpose without being void for all purposes. In any event, their contention was fully canvassed and specifically and correctly rejected in Ruiz Alicea, 180 F.2d at 871. See also DeLima v. Bidwell, 182 U.S. 1, 195–196, 21 S.Ct. 743, 45 L.Ed. 1041; Dooley v. United States, 182 U.S. 222, 234, 21 S.Ct. 762, 45 L.Ed. 1074. The Supreme Court explained long ago that questions concerning the power of a sovereign to annul by treaty a prior grant to his subjects "are political questions and not judicial" which "belong exclusively to the political department of government." Doe ex dem Clark v. Braden, 16 How. 635, 656, 14 L.Ed. 1090. Nor is defendants' contention aided by the argument that, since Spain had no legal right to impose compulsory military service upon the citizens of Puerto Rico, the United States could not have acquired that right by cession. To the contrary, the cession resulted, in the long run, in Puerto Ricans becoming citizens of the United States. Whatever limitations there were upon their duties as subjects of the King of Spain, it can hardly be thought that they now have less duties than do other citizens of this country. Compare Vilas v. City of Manila, 220 U.S.

25. Defendants contend that the vote accepting the compact could not have legitimized the application to Puerto Rico of the Selective Service Act, on the grounds that the constitutional rights of an individual are not subject to limitation by majority vote in an election. Compare Lucas v. Forty-Fourth Colorado Gen. Assembly, 377 U.S. 713, 736, 84 S.Ct. 1459, 12 L.Ed.2d 632. This argument exposes the essential fallacy of their whole position. An individual need not personally possess the franchise in order to be constitutionally subject to compulsory military service. George v. United States, supra. Defendants recognize this principle, and hence base their objection to their induction on the ground that the community of which they are members is denied the national franchise. Thus, it is only the *obligation* which they seek to avoid which is personal; the asserted right whose denial they offer as justification for such avoidance is *communal*. A community, however, can waive, barter away, or fail to claim its corporate rights the same as an individual can waive, barter away, or fail to claim his personal rights. Defendants have no standing, as individuals, either to object to the waiver or to assert that their personal obligations as citizens were diminished thereby.

345, 357, 31 S.Ct. 416, 55 L.Ed. 491; Chicago, Rock Island & Pacific Railway Co. v. McGlinn, 114 U.S. 542, 546, 5 S.Ct. 1005, 29 L.Ed. 270; Downes v. Bidwell, 182 U.S. 244, 298, 21 S.Ct. 770, 45 L.Ed. 1088 (White, J., concurring).

## III. MOTIONS FOR OVERSEAS DEPOSITIONS AND DISCOVERY

The seven defendants in United States v. García Miranda, et al, Criminal Nos. 73–67, 67–67, 74–67, 75–67, 77–67, 80–67, 81–67, have moved under Rule 17(c) F.R. Crim.P., for an order directing the Secretary of Defense to produce certain documents for their inspection, and under Rule 15(a) for an order authorizing them to take the depositions of certain persons residing abroad. The documents which they seek to inspect consist essentially of orders and reports pertaining to the United States military activities in Vietnam. The depositions are sought from persons who, defendants aver, will testify that the United States troops' presence in Vietnam and their activities there are violative of settled international law.

 The indictments in each of the cases here charge that the defendant "did knowingly fail, neglect and refuse to submit to induction and to be inducted into the Armed Forces of the United States as directed and ordered to do so by [his local selective service board], which was a duty required of him under and in the execution of the Universal Military Training and Service Act and the rules and regulations issued thereunder." Thus, in each case, only a narrow factual issue is presented: viz., whether "there was deliberate purpose on the part of [each defendant] not to comply with the Selective Service Act or the regulation[s] issued thereunder."

Ward v. United States, 344 U.S. 924, 73 S.Ct. 494, 97 L.Ed. 711; see also United States v. Henderson, 180 F.2d 711, 716 (C.A.7, 1950), certiorari denied, 339 U.S. 963, 70 S.Ct. 997, 94 L.Ed. 1372. The only evidence which may properly be submitted to the jury is that which pertains, not only to each defendant's failure to submit to induction on the date ordered, but of his knowledge of his duty to submit to such induction and whether his refusal to do so was deliberate or inadvertent. Cf. Graves v. United States, 252 F.2d 878, 882 (C.A.9, 1958); Pardo v. United States, 369 F.2d 922, 926 (C.A.5, 1966); Silverman v. United States, 220 F.2d 36, 39–40 (C.A.8, 1955); United States v. Weiss, 162 F.2d 447, 448 (C.A.2, 1947), certiorari denied, 332 U.S. 767, 68 S.Ct. 76, 92 L.Ed. 352; United States v. Hoffman, 137 F.2d 416, 419 (C.A.2, 1943); United States v. Trypuc, 136 F.2d 900, 901–902 (C.A.2, 1943). The nature and legality of American military activities in Vietnam are clearly irrelevant and immaterial to the narrow issue presented by the indictments. Discovery under Rule 17(c) is limited to items which are "admissible in evidence" (Bowman Dairy Co. v. United States, 341 U.S. 214, 221, 71 S. Ct. 675, 95 L.Ed. 879), and depositions under Rule 15(a) may be taken only if the defendant carries the burden of establishing that the prospective witness' testimony will be material. United States v. Steel, 359 F.2d 381, 382 (C.A. 2, 1966); United States v. Broker, 246 F.2d 328, 329 (C.A.2, 1957), certiorari denied, 355 U.S. 837, 78 S.Ct. 63, 2 L.Ed. 2d 49; United States v. Glessing, 11 F. R.D. 501, 502 (D.Minn., 1951); see In re United States, 348 F.2d 624, 626 (C.A.1, 1965). The motions must therefore, of necessity, be denied.[26]

26. Since the Court finds the subject matter of the proposed depositions irrelevant and immaterial, it is unnecessary to determine whether defendants carried their burden of establishing some irremediable impediment to the personal appearance at the trial by each of the proposed witnesses. The Court expresses grave doubt, however, that the allegations in the moving papers were sufficient to carry this burden. See, generally, In re United States, supra; United States v. Soblen, 203 F.Supp. 542, 568–569 (S.D. N.Y., 1961), affirmed, 301 F.2d 236 (C.A.2, 1962), certiorari denied 370 U.S. 944, 82 S.Ct. 1585, 8 L.Ed.2d 810; United States v. Van Allen, 28 F.R.D. 329, 346 (S.D.N.Y., 1961), affirmed, sub nom. United States v. Kelly, 349 F.2d 720, 769, 770 (C.A.2, 1965), certiorari

Defendants have offered various arguments for expanding the factual issue presented by these cases and thereby attaching relevance and materiality to the evidence which they seek, but none of the arguments have merit. Contrary to their suggestion, the authority of the government to impose the duty of military service upon its citizens does not depend upon a judicial determination that American activities in Vietnam accord with international law and treaty obligations. In the first place, defendants have no standing to raise the issue, since they are charged only with refusing induction, not with refusing to obey an order assigning them to Vietnam, and it is entirely a matter of conjecture whether their induction ever would have led to their receiving such an order. United States v. Bolton, 192 F.2d 805, 806 (C.A. 2, 1951); see also United States v. Mitchell, 369 F.2d 323, 324 (C.A.2, 1966), certiorari denied, 386 U.S. 972, 87 S.Ct. 1162, 18 L.Ed.2d 132. More importantly, a judicial inquiry into the conduct of foreign policy or the use and disposition of military forces by the executive branch would violate the doctrine of separation of powers which is at the heart of our constitutional system of government. Luftig v. McNamara, 126 U.S.App.D.C. 4, 373 F.2d 664, 665–666 (1967), certiorari denied, 387 U.S. 945, 87 S.Ct. 2078, 18 L.Ed.2d 1332; see also Marbury v. Madison, 1 Cranch 137, 165–166, 169–170, 2 L.Ed. 60; Williams v. Suffolk Insurance Co., 13 Pet. 415, 420, 10 L.Ed. 226; Chicago & Southern Air Lines v. Waterman SS Corp., 333 U.S. 103, 108, 111, 68 S.Ct. 431, 92 L.Ed. 568; Baker v. Carr, 369 U.S. 186, 211–212, 217, 82 S.Ct. 691, 7 L.Ed.2d 663.

In Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60, the case that first established the principle of judicial review over the acts of the executive and legislative branches, Chief Justice Marshall very carefully circumscribed the area of that review, saying (id. at 165–166, 2 L.Ed. 60):

It follows then, that the question, whether the legality of an act of the head of a department be examinable in a court of justice or not, must always depend on the nature of that act. If some acts be examinable, and others not, there must be some rule of law to guide the court in the exercise of its jurisdiction. In some instances, there may be difficulty in applying the rule to particular cases; but there cannot, it is believed, be much difficulty in laying down the rule. *By the constitution of the United States, the president is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience.* To aid him in the performance of these duties, he is authorized to appoint certain officers who act by his authority, and in conformity with his orders. In such cases, their acts are his acts; and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion. *The subjects are political: they respect the nation, not individual rights, and being entrusted to the executive, the decision of the executive is conclusive.* The application of this remark will be perceived, by adverting to the act of congress for establishing the department of foreign affairs. This officer, as his duties were prescribed by that act, is to conform precisely to the will of the president: he is the mere organ by whom that will is communicated. The acts of such an officer, as an officer, can never be examinable by the courts. (Emphasis added);

denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544; United States v. Bentvena, 319 F.2d 916, 941 (C.A.2, 1963), certiorari denied, sub nom. Ormento v. United States, 375 U.S. 940, 84 S.Ct. 345,

11 L.Ed.2d 271; United States v. Grado, 154 F.Supp. 878, 879 (W.D.Mo., 1957); United States v. Rickenbacker, 27 F.R.D. 485, 486 (S.D.N.Y., 1961).

and again (id. at 169–170, 2 L.Ed. 60):

> The intimate political relation subsisting between the President of the United States and the heads of departments, necessarily renders any legal investigation of the acts of one of those high officers peculiarly irksome, as well as delicate; and excites some hesitation with respect to the propriety of entering into such investigation. Impressions are often received, without much reflection or examination, and it is not wonderful, that in such a case as this, the assertion, by an individual, of his legal claims in a court of justice, to which claims it is the duty of that court to attend, should at first view be considered by some, as an attempt to intrude into the cabinet, and to intermeddle with the prerogatives of the executive. It is scarcely necessary for the court to disclaim all pretensions to such a jurisdiction. An extravagance, so absurd and excessive, could not have been entertained for a moment. *The province of the court is, solely, to decide on the rights of individuals, not to inquire how the executive, or executive officers, perform duties in which they have a discretion. Questions in their nature political, or which are by the constitution and laws, submitted to the executive, can never be made in this court. (Emphasis added.)*

Shortly thereafter, the Supreme Court, in Williams v. Suffolk Insurance Co., 13 Pet. 415, 10 L.Ed. 226, applied these principles to hold that, where the executive branch had taken the position that a foreign government did not have title to certain territory, a court, despite the relevancy of the matter to the case at hand, had no competence to inquire further into the question. The Court explained (id. at 420, 10 L.Ed. 226):

> And can there be any doubt, that when the executive branch of the government, which is charged with our foreign relations, shall, in its correspondence with a foreign nation, assume a fact in regard to the sovereignty of any island or country, it is conclusive on the judicial department? And in this view, it is not material to inquire, *nor is it the province of the court to determine whether the executive be right or wrong.* It is enough to know, that in the *exercise of his constitutional functions,* he had decided the question. *Having done this, under the responsibilities which belong to him it is obligatory on the people and government of the Union.* If this were not not the rule, cases might often arise, in which, on the most important questions of foreign jurisdiction, there would be an irreconcilable difference between the executive and judicial departments. By one of these departments, a foreign island or country might be considered as at peace with the United States; whilst the other would consider it in a state of war. *No well-regulated government has even sanctioned a principle so unwise, and so destructive of national character.* (Emphasis added.)

More recently, the Court, in Chicago & Southern Air Lines v. Waterman SS Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568, held that the grant of an overseas air route by the Civil Aeronautics Board, approved by the President, was—unlike the grant of a domestic route which did not require presidential approval—not judicially reviewable, because the former action involved considerations of national defense and foreign relations (id. at 108), and (id. at 111, 68 S.Ct. at 436):

> The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports neither are nor ought to be published to the world. *It would be intolerable that courts, without the relevant information should review and perhaps nullify actions of the Executive taken on information properly held secret.* Nor can courts sit *in camera* in order to be taken into executive confidences. But even if courts could require full disclosure, *the very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are*

*wholly confided by our Constitution to the political departments of the government, Executive and Legislative.* They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry. (Emphasis added.)

Most recently, the Court undertook in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, to survey all facets of the "political question" subject. While cautioning that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance," it found that those questions do which "turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature * * * [or] uniquely demand single-voiced statement of the Government's views." Id. at 211, 82 S.Ct. at 707. Thus, it noted, for example, that courts will construe treaties only if the executive has not done so, and that while, once sovereignty over an area is politically determined, courts will examine the resulting status and decide independently whether a statute (such as the Fair Labor Standards Act or tariff legislation) applies to the area, "recognition of foreign governments * * * strongly defies judicial treatment * * * and the judiciary ordinarily follows the executive as to which nation has sovereignty over disputed territory." Id. at 212, 82 S.Ct. at 707. Finally, summing up the whole matter of "political questions," the Court held (id. at 217, 82 S.Ct. at 710):

Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and man-

ageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Defendants' contention that this Court must decide the legality of the United States military forces' activities in Vietnam in order to determine whether they were under a duty to submit to induction flies directly in the face of these principles. Clearly, it may be said in this case—where the order defendants are charged with disobeying required merely their induction into the armed forces—what was said in Luftig v. McNamara, 126 U.S.App.D.C. 4, 373 F.2d 664, 665–666 (1967), certiorari denied, 387 U.S. 945, 87 S.Ct. 2078, 18 L.Ed.2d 1332, where a person already a member of the armed forces sought an injunction against his being assigned to Vietnam on the grounds that the presence of the United States military forces there was unlawful:

It is difficult to think of an area less suited for judicial action than that into which Appellant would have us intrude. The fundamental division of authority and power established by the Constitution precludes judges from overseeing the conduct of foreign policy or the use and disposition of military power; these matters are plainly the exclusive province of Congress and the Executive.

No treaty can authorize the judiciary to undertake an inquiry forbidden to it by the Constitution. Compare Geofroy v. Riggs, 133 U.S. 258, 267, 10 S.Ct. 295, 33 L.Ed. 642; Reid v. Covert, 354 U.S. 1, 15–18, 77 S.Ct. 1222, 1 L.Ed.2d 1148, (plurality opinion). Nor would this court or the jury be authorized to under-

take such an inquiry on the basis of defendants' contention that they would have risked criminal liability under the Charter of the International Military Tribunal (59 Stat. 1546) and the Nuremberg judgments arising therefrom had they permitted themselves to be inducted. Mere membership in the armed forces could not under any circumstances create criminal liability. Compare Ford v. Surget, 97 U.S. 594, 605–606, 24 L.Ed. 1018. Our domestic law on conspiracy does not extend that far (see Ingram v. United States, 360 U.S. 672, 678, 79 S.Ct. 1314, 3 L.Ed.2d 1503; Direct Sales Co. v. United States, 319 U.S. 703, 713, 63 S.Ct. 1265, 87 L.Ed. 1674; United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128), and neither did the Nuremberg judgments. Cf. Case No. 12, United States v. von Leeb (the High Command Case), 10 & 11 Trials of War Criminals Before the Nuremberg Military Tribunals, at 11 Tr.W.Crim. 488–489; Case No. 9, Trial of Tesch (the Zyklon B Case), 1 Law Rep. of Tr. of W. Crim. 93, 102.

▮▮▮▮▮ Nor is the evidence which defendants seek relevant and material on the theory that it will support either their claim to a right of conscience not to enter the armed forces or their contention that their refusal to be inducted lacked criminal intent because they did not act with "bad purpose or evil motive." The exemption for conscience contained in the Selective Service Act (50 U.S.C. App. § 456(j) does not extend to those who, like defendants, assert only selective scruples against a particular war, even if such scruples are grounded upon religious beliefs arising from adherence to an organized church. United States v. Spiro, 384 F.2d 159, 160–161 (C.A.3, 1967), certiorari denied, 390 U.S. 956, 88 S.Ct. 1028, 19 L.Ed.2d 1151. Moreover, since defendants have made no showing that they claimed an exemption for conscience from their local boards, they are precluded from raising the issue for the first time at trial. Falbo v. United States, 320 U.S. 549, 552–553, 64 S.Ct. 346, 88 L.Ed. 305; Estep v. United States, 327 U.S. 114, 123, 66 S.Ct. 423, 90 L.Ed. 567; United States v. Irons, 369 F.2d 557, 559 (C.A.6, 1966); United States v. Schoebel, 201 F.2d 31, 32 (C.A.7, 1953); compare United States v. Rubinstein, 166 F.2d 249, 257–258 (C.A.2, 1948), certiorari denied, 333 U.S. 868, 68 S.Ct. 791, 92 L.Ed. 1146. The "bad purpose or evil motive" requisite to criminal intent means no more than an intent to defeat the objective for which a legal duty is imposed or a legal prohibition is erected. Silverman v. United States, supra, 220 F.2d at 40; compare Heikkinen v. United States, 355 U.S. 273, 279–280, 78 S.Ct. 299, 2 L.Ed.2d 264; Screws v. United States, 325 U.S. 91, 101–107, 65 S.Ct. 1031, 89 L.Ed. 1495 (plurality opinion); Spies v. United States, 317 U.S. 492, 499–500, 63 S.Ct. 364, 87 L.Ed. 418. It does not require that the actor be motivated by ignoble or venal considerations. See Hamilton v. Regents of University of California, 293 U.S. 245, 268, 55 S.Ct. 197, 79 L.Ed. 343 (Cardozo, J., concurring); Cannon v. United States, 181 F.2d 354, 356 (C.A.9, 1950), certiorari denied, 340 U.S. 892, 71 S.Ct. 199, 95 L.Ed. 647; Warren v. United States, 177 F.2d 596, 600 (C.A.10, 1949), certiorari denied, 338 U.S. 947, 70 S.Ct. 485, 94 L.Ed. 584; United States v. Miller, 233 F.2d 171, 172 (C.A.2, 1956); United States v. Madole, 145 F.2d 466, 468 (C.A.2, 1944); United States v. Mroz, 136 F.2d 221, 226 (C.A.7, 1943), petition for certiorari dismissed, 320 U.S. 805, 64 S.Ct. 23, 88 L.Ed. 487. Defendants are not within the narrow exception to the usual meaning of "bad purpose or evil motive" illustrated by United States v. Murdock, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381 and Okamoto v. United States, 152 F.2d 905 (C.A.10, 1946). Their asserted belief that they were constitutionally excused from submitting to induction because of the unlawfulness of American activities in Vietnam (as well as because of the constitutional inapplicability of the Selective Service Act to Puerto Rico) is not bottomed upon a claim, as in *Murdock*, that the Constitution in terms excuses them from the per-

formance of their statutorily compelled duty, or, as in *Okamoto*, that they have *personally* been subjected to invidious discrimination. Moreover, there is no constitutional provision which is "capable of being honestly and reasonably understood" to support their position on either ground. Compare Rainbow Dyeing & Cleaning Co. v. Bowles, 80 U.S.App.D.C. 137, 150 F.2d 273, 279 (1945). To the contrary, the lack of constitutional merit in both of the excuses which they offer has been long settled. Compare Browder v. United States, 312 U.S. 335, 341, 61 S.Ct. 599, 85 L.Ed. 862; United States v. Kahriger, 210 F.2d 565, 569 (C.A.3, 1954). There is, therefore, nothing in these cases which requires evidence on any question other than each defendant's awareness of his statutory duty and the deliberateness of his refusal to perform it.

### ORDER

For the foregoing reasons, it is ordered that all defendants' motions, and each of them, be, as they are hereby, denied.