**UNITED STATES of America,**
**Plaintiff,**

v.

**Edwin FELICIANO-GRAFALS,**
**Defendant.**

**Crim. No. 81–67.**

United States District Court,
D. Puerto Rico.

Jan. 23, 1970.

Roberto Jose Maldonado, San Juan, P. R., Michael Standard, New York City, Olaguibeet Lopez-Pacheco, San Juan, P. R., for defendant.

Roy Bartlett, Washington, D. C., Lawrence McSoud. Tulsa, Okl., (both by designation) for plaintiff.

## OPINION AND AMENDED SENTENCE

CANCIO, Chief Judge.

■  The fulfillment of my desire to reduce the sentence in this case under Rule 35 of the Federal Rules of Criminal Procedure has been delayed because, upon knowing that I had asked the Court of Appeals to return the case to us for this limited purpose, the United States Attorney moved the Court for permission to be heard orally, and even though I denied his request, I gave both parties the opportunity to file a memorandum. The U. S. Attorney has filed his memorandum. The defendant chose not to. The main point raised in the memorandum of the Government is that this Court lacks jurisdiction because the case is already on appeal. I do not agree. That would have been the law had the Court of Appeals not returned the case to me for reduction of sentence. But, in so doing, the higher court is re-granting this Court the jurisdiction to proceed as planned.

In each and every case cited by the United States Attorney in support of his contention, the sentence is on appeal but the case has not been returned to the lower court. That is not the situation in our case. As a matter of fact, I think that if I were to refuse to act now for fear of lack of jurisdiction to reduce the sentence, I would appear as pretending to reverse the Court of Appeals, which returned the case to this court precisely so that I may act in the manner announced in my request. That I cannot do.

The remaining arguments on other points raised by the United States Attorney are not convincing and will not be discussed here.

■■  According to the law, a reduction of sentence may be made even in the absence of the defendant.[1]  So shall I do today, considering the time element here involved. Nevertheless, since I had written some statements that I would have read to the defendant, and since there is no time left to re-write these rather long expressions of the Court, I will copy them here as they were originally conceived. They may sound strange because, as stated, they are writ-

---

1.  Rule 43 Federal Rules of Criminal Procedure.

ten for a situation in which the defendant would have been present. He is not. But I had to leave them as I wrote them,[2] lest I run the risk of losing jurisdiction with the passage of time, since the 120 days within which I am supposed to act under Rule 35 constitute a fatal term. Today is Friday, and is the 119th day. I must act at once.[3]

This is what I would have told the defendant had he been before me:

Mr. Feliciano Grafals, I have called you for further proceedings in your case. Before I explain to you the exact purpose of your having been called to appear before me today, a summary of the prior proceedings had in your case becomes necessary.

After having been indicted by a grand jury for three alleged violations of sections 454 and 462 of the Universal Military Training and Service Act (now Military Selective Service Act), and after several pre-trial motions were disposed of by the Court, you were finally brought before a petit jury to be tried. Some evidence having been presented, partly in the presence of the jury and partly before the judge alone, your attorneys made motions for the dismissal of all three counts. I held in your favor as to two of the three motions, with the result that two counts were dismissed,[4] and only one remained for the jury's consideration. At the end of the evidence, the jury found you guilty of the only crime with which you were then charged, namely, refusal to submit to induction.

▆▆▆ As usual, I asked the United States Probation Officer for a presentence report. You remained at liberty pending sentence. The report revealed, among other details, that you considered yourself innocent of the crime of which you had been found guilty and that, therefore you rejected completely the idea that the Court should even consider the possibility of imposing a sentence on probation. I, the judge, had no alternative but to sentence you to imprisonment, payment of a fine, or both. You made that choice for me.

On September 26, 1969, after I went through the formalities which precede every sentencing, in response to my questioning you affirmed your stand that you would not accept probation. I then did the only thing I could, and was as lenient as I thought at the time that I could be. Because I considered, and still consider you, not a criminal, but an honest citizen who technically has violated a penal law, I sentenced you to the least number of years possible— one.

You, then, through your attorneys, filed a notice of appeal. You moved that you be allowed to remain at liberty while your case was on appeal, on the same bail you had originally given. I granted the motion, and went somewhat further. Because I was convinced that in your case there was no danger of your fleeing the jurisdiction of the court or otherwise becoming unavailable when the court needed you, I left you free on your own recognizance, that is, without your even having to post any bond at all. You have remained this way since then and this is your condition at present.

The hearing for which you have been summoned is pursuant to Rule 35 of the Federal Rules of Criminal Procedure.

2. When I filed this opinion and sentence, I promised to make some changes in style, for which I did not have the time at that moment. All my efforts to better its literary style without spoiling the message it contains were fruitless. The message was not the same. I have preferred to sacrifice literary style.

3. Perhaps the term automatically extends to the working day following the 120th, but we preferred not to run any risk.

4. The counts dismissed are "failure to have registration certificate" and "failure to have notice of classification," Sel.Serv. Regs. 1617.1 and 1623.5. These counts were dismissed on a motion for acquittal on the ground that in the circumstances of this case, the FBI agent who arrested the defendant had no right to ask for his registration card or classification notice.

The rule in question reads, in part, as follows: " * * * The court may reduce a sentence within 120 days after the sentence is imposed * * *."

As noted before, from September 26, 1969 to today, January 23, 1970, only 119 days have gone by. Therefore, the Court is still in the position of being able to change your original sentence; it has jurisdiction to do so. By way of parenthesis, I will add that this Court was without jurisdiction to act under Rule 35 because of your filing your notice of appeal. The Court of Appeals, though, at the request of this Court, has returned the case to us to proceed under Rule 35.

The circumstances prevailing when I sentenced you, as far as I know, have not changed in so far as to affect the length of the sentence imposed on you. Nor has the statute been amended. Similarly, my attitude towards you today is the same it was then. Nevertheless, a few days ago, while I was meditating on the substantial justice of your case, which I have not ceased to do from many days before I sentenced you, I thought of and rediscovered certain powers given to me by the law, which I can exercise on your behalf and on behalf of the justice of the case.

■ Upon sentencing a defendant and when reconsidering a prior sentence to vary its terms, the court owes no one any explanations. Nevertheless, in some cases in order to achieve a better administration of justice in the future and in order not to induce part of the public to error, it becomes convenient to explain the wherefores of a sentence. I think that this is necessary today. I also think that it is necessary to explain, not only for your own benefit but for the benefit of other citizens, your motives, as I see them, in acting contrary to the clear language of the law. For this, one must of necessity refer to the problem of the political status of Puerto Rico, a problem which worries you—as well as me and so many other Puerto Ricans—so profoundly and sincerely. For a better understanding of the situation, it is necessary to make a brief—perhaps too brief—statement of the pertinent historical facts.

From its discovery and up to at least 1897, Puerto Rico was a colony of Spain, despite the various ups and downs which occurred regarding its greater or lesser degree of self-government at different times.[5] But the truth is that the Puerto Rico of the end of the 19th century was no longer merely a colony or group of second, third or further generations of Spaniards, transplanted to the new world. Puerto Rico had already, although it remained politically united and subject to Spain, severed its umbilical cord with the mother country and had acquired its own personality, with its own culture and idiosyncrasy.[6] When in 1898 it passed from the Spanish

5. In 1897, just one year before the beginning of the United States regime, Spain had approved the Autonomic Charter which, for many scholars, granted Puerto Rico the most nearly perfect kind of local self government imaginable and recognized to the island, through delegates with voice and vote in the Spanish legislature (the cortes), although not for the first time, a saying even in the Spanish national affairs. This extremely liberal charter could never be really tested, precisely because of the change of regime which came as a result of the victory of the United States over Spain in the Spanish-American War, which in 1898 put an end to the Spanish domination of Puerto Rico and brought about a temporary American military government in the island. (For an outstanding and scholarly analysis of the Autonomic Charter and the historical facts surrounding it, see Judge Marco A. Rigau's dissenting opinion in Popular Democratic Party v. Hon. Luis A. Ferré, Governor of the Commonwealth of Puerto Rico, (Supreme Court of Puerto Rico, February 2, 1970) No. 0–69–98, issued shortly after the filing of this Opinion and Amended Sentence.

6. There is no need, for the purpose of this case, to analyze the factors, social, cultural, ethnical and otherwise, which were then and are now responsible for the Puerto Rican personality, as distinguished from that of Spain, the United States or any other country.

regime to the American, Puerto Rico continued to be what it was before, with one variation; with regard to the United States, the cultural, ethnic, idiosyncratic and language differences were, and still are, even though to a slightly lesser degree than before, considerably bigger. Puerto Rico continued to be, although still a colony, a people, a group of people distinguishable from other groups of people and a country distinguishable from other countries in the world. As a matter of fact, Puerto Rico was in time of Spain, continued to be after 1898 and still is today, a nation, with all the distinguishing characteristics this concept implies, with the exception—very important in politics but unimportant to its reality and vitality as a country—that it has never had an officially recognized international personality, and, therefore, has not participated as an independent entity in the concert of other nations of the world. As we shall see later, it is not the province of this Court to enumerate, analyze nor evaluate the reasons why this is so. Whether or not the will of the people of Puerto Rico has intervened in it—the Court believes it has, on account of the constitutional process leading to the Commonwealth status—the historical reality with which you, the defendant in this case, were confronted, was that and no other, as looked upon from your own points of view.

It was a similar historical reality which, shortly before 1950, motivated a group of American citizens from Puerto Rico and a group of members of the Congress of the United States to try to find an adequate solution to the political status of Puerto Rico. The politico-constitutional development process which took place between 1950 and 1952, and which resulted in the creation of the Commonwealth of Puerto Rico and the approval by the Puerto Ricans

of their own Constitution, seemed and still seems to many the answer to the political problem of the island, although they were conscious that the Commonwealth could and should be improved; should "culminate," to employ the term used later by a particular political party to refer to the goal of the growth of the Commonwealth. But what seemed and still seems to many an agreement between two peoples, binding on both and "in the nature of a compact"—[7] pursuant to which, to oversimplify matters, Puerto Rico consented to its international relations and other aspects of its "nationality" being administered by the United States, while the latter recognized a complete local self-government in the internal affairs of the island, neither one nor the other being able to modify it except by mutual consent—seemed to others a mere change of name for the colony, simply adding a new name [8] and an apparent consent by the people of Puerto Rico, perpetuating thus what has been called in derogatory terms a colony by consent.

Regardless of who is right, there is today a respectable number of respectable people, some of them to be found even among the defenders of the Commonwealth status, who honestly believe that the United States governs in Puerto Rico in the limited form allowed it by the Puerto Rican Federal Relations Act, without there having really been consent of the people of Puerto Rico. These people believe in all good faith that the generic consent given in the consultations via referenda made of the people at the ballot boxes between 1950 and 1952 were not a consent sufficient to permit the federal Congress to legislate for Puerto Rico in matters so vital to its life as a people, only one of which we need mention here, compulsory military service.[9]

---

7. P.L. 600, 81st Congr., Jul. 3, 1950, 64 Stat. 319.

8. Commonwealth of Puerto Rico or Estado Libre Asociado de Puerto Rico, which translated into English means Associated Free State of Puerto Rico.

9. It must be remembered that Puerto Rico is not represented in either house of the

■ It should be repeated and clearly understood at this point that the Court is not saying or even suggesting that those who so believe are correct.[10] On the contrary, this Court has expressly and repeatedly upheld the validity of the Compact.[11] It has also decided in this very case that the extension of the Military Selective Service Act to Puerto Rico is not unconstitutional and that its application to Puerto Ricans is not invalid.[12] Were it otherwise, last September 26, I could not have sentenced you, a Puerto Rican citizen; were it otherwise, I could not today even reduce your sentence, as I intend to do shortly. Even if I were to consider that if the question of whether or not the Military Selective Service Act should apply to the citizens of Puerto Rico were submitted to the Legislative Assembly of Puerto Rico, or to the people directly by referendum, it would receive overwhelming approval despite the popular consensus repudiating the war in Viet Nam, the fact is that such specific consent has not been given by the people of Puerto Rico, and thus, albeit constitutional and valid, the application of the Act to Puerto Rico may be, rightly or not, honestly thought of as neither just nor democratic.[13]

■ It is elementary that courts can not declare statutes null or unconstitutional because they seem to the court unjust or undemocratic. To pass or not to pass just and democratic laws is the prerogative of the legislator. Courts rule only on their constitutionality. Having found the law to be constitutional, and you having been found guilty by the jury of its violation, the only thing left in our realm is the sentence.

■ I have made this introduction, which perhaps may seem unnecessary, in order to put you, the defendant in this case, in the correct perspective within the framework you found before you when you were required by law to enter the Armed Forces of the United States, as well as your motives for refusing to do so. According to the evidence believed by this judge—and perhaps by the jury—you believe, without there being any doubt as to your good faith, sincerity and honesty, that the tenure of the United States in Puerto Rico has no reason for being and is not justified; that it is without the consent of the people of Puerto Rico and against its will. The overwhelming majority of the people of Puerto Rico may believe you completely wrong, but that is your truth, the truth in which you honestly believe. And you believe in that, your truth, as honestly and in good faith as so many other Puerto Ricans believe in their own truth, which is diametrically opposed to yours. You believe, for the same reasons, with the same conviction and just as honestly, that the Military Selective Service Act is not constitutional nor valid, insofar as it applies to Puerto Ricans, who were not represented with a voice and vote in the legislative body which approved it. Your conscience does not permit you to serve compulsorily in the United States Armed Forces, regardless of how justified or unjustified are the wars this nation is engaged in. This, according to this Court which does not share your views,

Congress through delegates with voice and vote. The Resident Commissioner of Puerto Rico in Washington does have voice in the lower House, but he has no vote. Nor do Puerto Ricans vote for President.

10. I had the privilege, together with another colleague, to be the first to write an opinion on the validity of the Commonwealth status, back in 1955. My views on the point expressed then in the case of Hilton Hotels International, Inc., 2 DJRT 888, have not changed an iota, nor

has what I expressed in United States v. *Valentine*, D.C., 288 F.Supp. 957.

11. *Valentine, supra*, Liquilux Gas Services of Ponce, Inc. v. Tropical Gas Co., D.C., 303 F.Supp. 414 (1969), and cases cited therein.

12. *Valentine, supra*.

13. In fact, it may also honestly be believed that the law is unconstitutional applied to Puerto Rico, which adds even more to the belief that it is unjust and undemocratic.

makes you a conscientious objector in the true meaning of this term, to service in the armed forces of the United States, although, as we have held before, you are not such in the juridical sense this term has in the Military Selective Service Act. Had I written that law, I would have considered you a conscientious objector such as to exempt you from compulsory military service. That I am not able to do because I am a judge and not a legislator. Nevertheless, and although I cannot legislate, I can mitigate, albeit in a limited way, the unjust effects which, in certain cases and under specific circumstances, I may find in the laws I am called upon to interpret. That is what I tried to do on September 26, 1969, when I sentenced you to the minimum number of years to which you could be sentenced—one.

During the days which preceded your sentencing, for the reasons here set out, and because, as I said a moment ago, I considered that I had before me not a criminal but a man who, only technically, was a violator of the law, I studied every possibility of avoiding your imprisonment. Nor did a fine turn out to be the answer to my worries, as you, who were litigating *in forma pauperis*, could not afford to pay it. I exhausted every imaginable legal resource, and yet I could not find a way to avoid that sentence I had to pronounce. Your opposition to the Viet Nam war, although

sincere and perhaps justified, was not, I believed then and I believe today, a valid excuse for not complying with the law. As to this, your remedy as an American citizen is to permit yourself to be drafted, possibly to fight other just wars or not to fight any war at all, and claim your right not to fight in the Viet Nam war if and when you are required to do so, using the legal resources at your reach, both administrative and judicial. On the other hand, because you were not opposed to violence, to war in any form, you were not a conscientious objector under the law. When asked, you frankly admitted that you would consider fighting certain types of wars, and gave as example precisely a war for the independence of Puerto Rico. Because you were not opposed to war as such, to all wars, you could not be a "conscientious objector" under the law. And you could not be so, even though this Court has held from the bench that reasons of a religious nature are not needed to be considered a conscientious objector under the law, and that inasmuch as the Military Selective Service Act limits this right to the religious, it is unconstitutional and void.[14]

Neither the jurisprudence I read and reread, nor the long hours I spent in meditation, helped me avoid sentencing you. I had to be content with the most lenient sentence I thought I could impose.[15] Today I realize that I fell short.

14. This was not the first Court so to find. Chief Judge Charles Wyzanski, from the U. S. District Court for the District of Massachusetts, had done so a few weeks before. United States v. Sisson, 297 F. Supp. 902, 903. Although I agree with Judge Wyzanski in that conscientious objection need not be based on religious motives, I disagree with him in that I do not think that objection to the war in Viet Nam alone is sufficient, or, for that matter, to any other single war in particular.

15. For the first and only time in my career, I did with this defendant something which I never have seen anybody do or even heard of it having been done. Shortly after the sentence, I called the defendant himself to approach the bench with at least one of his attorneys and the U. S.

Attorney, and spoke to him in Spanish and off-the-record, more or less as follows:

"Judges often suffer when sentencing human beings, even though those human beings happen to be hardened criminals. In your case, my suffering has been the greatest of all in the cases before me. It has been the greatest because I do not believe you are a criminal but a person who for ideas and ideals in which he firmly believes, has chosen to violate a law which he believes unjust, invalid and unconstitutional. I know that you love Puerto Rico. I love Puerto Rico as much as you do. The only difference is that we disagree as to what is best for our country. I wish you would have given me the opportunity to avoid this sentence by having

Even if it is true that I cannot change the law to conform to my wishes—a function reserved by the Constitution to the legislator—I can, as a judge, make it more just in its application to the specific cases which come before me, without violating the norms given me by the legislator, and within the limits fixed in the statute itself.

Every solution which had occurred to me up to a few days ago had to be rejected because it was repugnant to the law or needed your consent, as the defendant in this case.[16] Up until recently I thought that there was no legal solution which could minimize even more the effects of the law already minimized by my prior sentence. But there is a solution, although I had not realized it. The statute in question, in referring to the possible sentence to be imposed upon a violator, speaks of a maximum but not of a minimum, both in the case of fine and imprisonment. This I had read time and again, but it had not brought to my mind this new idea. The Congress of the United States, a most respectable body which represents the people of one of the most, if not the most, democratic governments of the world, in its wisdom and foresight regarding extraordinary cases, as we believe this one to be, provided this solution. The legislator did not want to put the judge in a straightjacket. He left the minimum sentence to the judge's discretion. This must have been for the purpose of allowing him, who knows the facts and particular situations in specific cases which could not be foreseen by the Congress, to mitigate the effects of the law in truly meritorious cases, by imposing a nominal sentence; such a benign sentence, in fact, that as a practical matter, it would be almost equivalent to not imposing any sentence at all. The

legislator undoubtedly wanted a judge, when he or a jury was bound by legal technicalities to find a defendant guilty against his or its best desires, to use the solution I have referred to. And that is precisely what I intend to do in a few minutes. Had Congress wanted to avoid sentences like this one, it could have done so simply by providing for a minimum. With all due respect to that respectable body which at the time of the approval of the law that we must apply today did not have in mind the case of a Puerto Rican conscientious objector to military service in the United States Army on grounds other than abhorrence of violence in any form, we have decided to be as lenient as possible and hope that, in imposing a nominal sentence in this case, we are not doing violence to, but rather are furthering the legislative will.

We have thoroughly searched through the legislative record of the penalty provisions of this statute for a reference to what we consider the special case of Puerto Rico. We have been unable to find anything in this respect. We are most sure that, consistent with the democratic tradition of the people of the United States and with its profound American sense of fair play and justice, had its representative, the Congress, had in mind the case of a Puerto Rican "independentista," honestly and deeply convinced that he is not constitutionally nor legally bound by the law which you have violated, Congress would have expressly made the necessary adjustments to insure that justice would be done. Congress did not have that case in mind and, consequently, did not make the necessary adjustments to insure that justice be done. Thus, it is up to the Court to use its constitutional and legal powers in such a way as to lessen to the

accepted probation. I think I understand why you would not voluntarily accept any conditions, but I am very sorry not to have been able to avoid sentencing you as I did. Good luck."

16. Among other possibilities, a suspended sentence or probation on condition that

the defendant serve in a non-profit hospital or similar organization or perform other public service at the same salary he would have received in the Army had to be abandoned for this reason.

utmost all possible injustice in a given set of circumstances. I hope that that is what I am doing today.

One last word that I hope will be a contribution to a better solution to the problem we face here and to problems similar to it. As long as Puerto Rico does not become a state of the Union by the very will of the people of Puerto Rico, expressed by whatever majority may seem necessary, in the exercise of their self-determination, or as long as Puerto Rico does not become an independent nation, also in the exercise of her self-determination by the will of the majority of the people of Puerto Rico, or as long as the present status of Commonwealth which we have sustained and reaffirm today is a status of dignity equal to the other two and permanent in nature, is not definitely clarified by the Congress of the United States and the people of Puerto Rico in a compact or any other document in which are expressly and unmistakenly recognized the capacity and the juridical personality of the people of Puerto Rico to enter into a contract with the Congress, binding on both parties, utilizing to describe such capacity or personality the word "sovereignty" or not, or, at least, as long as a practical solution is not adopted by the Congress, such as determining by federal law that the effect of the penal provisions of the Military Selective Service Act and similar laws shall not apply to Puerto Rico except if expressly approved by its Legislative Assembly and by its Governor, there will be cases like this one.[17] As previously stated, it is not up to this or any other court to make such determinations, and when the law happens to be constitutional as we have decided it is in this very case,[18] we have to apply the law. The only thing we can do is to alleviate its effects as we will do today and may do in a very limited number of cases in the future, and pray that the Congress and the people of Puerto Rico clarify the whole situation for the benefit of all concerned.

■ Note that I am not saying, nor even suggesting, that the Compact is non-existing or that it is not binding on the parties nor that Puerto Rico is a colony of the United States. On the contrary, the Compact does exist. It is binding on both parties.[19] Puerto Rico, we have been led to believe, ceased to be a colony of the United States on July 25, 1952 with the creation of the Commonwealth. All I am saying now is that the record regarding the creation of the Commonwealth between 1950 and 1952 is sufficiently dim for a respectable and intelligent person to believe otherwise in good faith and thereby take positions similar to the one taken by the defendant herein; and that clarification of the political relations between Puerto Rico and the United States will do no harm to anyone and will likely do a great deal of good to the common wellbeing.

Extending the Selective Service and similar acts to Puerto Rico only through the specific consent of the people of Puerto Rico would not be a bad idea. Nor would declaring an amnesty for those who have violated the present law in good faith.

I do not want to induce anyone into error by today's sentence. Let not the public become confused and believe that this decision will open the doors to anyone who alleges to be in similar circumstances as Edwin Feliciano Grafals, to receive a sentence like his. What I am doing today I might possibly do again in the future, but it will necessarily have to be in a very small number of cases of Puerto Ricans who believe in the same principles as this defendant, and with the same sincerity and firm-

17. The Court is not so ingenuous as to think that even under statehood there will not be Puerto Ricans who will refuse to submit to laws like this one. What the Court means to say is that in such a situation, decisions such as this one would not be justified.

18. United States v. Valentine, D.C., 288 F.Supp. 957.

19. See note 10 at Page 10.

ness of conscience as Edwin Feliciano Grafals.

 In view of the thoughts heretofore expressed, this Court hereby reduces the sentence it imposed on September 26, 1969 on Edwin Feliciano Grafals, the defendant herein, from one year of imprisonment to one hour of imprisonment, to be served, according to law, in the place to be designated by the Attorney General or his authorized representative. Due to the shortness of this sentence, it is strongly suggested that it be served at the Marshal's office in the place where he keeps other defendants waiting for court action.

Sentence shall be entered accordingly.

The record of this case shall be returned to the Court of Appeals for the First Circuit.

It is so ordered.